### In re FIRST FINANCIAL ASSOCIATES, INC., Debtor.

### Kenneth A. Manning, Trustee, Plaintiff,

### v.

### Dorothy Wallace, First Financial Mortgage, Inc., Elmer Shults, Dorothy L. Wallace, Personal Representative of the Estate of Darrell E. Shults, deceased and Sole Heir, and First Financial Business Group, Inc., Defendants.

**Bankruptcy No. 99–62270 JPK. Adversary No. 01–6148.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

July 20, 2007.

Kenneth A. Manning, Esq., James, James & Manning, P.C., Dyer, IN, for the Plaintiff/Chapter 7 Trustee.

Dorothy Wallace, pro se.

Elmer Shults, pro se.

*MEMORANDUM AND DECISION OF FINAL JUDGMENT/FINDINGS OF FACT AND CONCLUSIONS OF LAW*

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding was initiated by the complaint of Kenneth A. Manning, Chapter 7 Trustee ("Trustee") of First Financial Associates, Inc. ("Debtor") filed on June 29, 2001. The complaint designat-ed five (5) defendants: Dorothy L. Wallace personally; Dorothy L. Wallace as the Personal Representative of the Estate of Darrell E. Shults, deceased; Elmer Shults; First National Business Group, Inc.; and First Financial Mortgage, Inc.

Following a tortured and twisted path toward resolution—which is not material to the Court's determination of its final judgment and will not be recited here—the Court issued its Memorandum of Decision on Cross–Motions for Summary Judgment on October 13, 2005. On pages 4–6 of that document, the Court stated the issues which were deemed to have been placed before it by the parties for the purposes of disposition under Fed.R.Bankr.P. 7056/ Fed.R.Civ.P. 56. As stated in the October 13, 2005 order, certain issues were deter-mined in that order pursuant to the provi-sions for summary judgment under the foregoing Rules; certain issues presented for summary judgment by the parties were not deemed by the Court to be susceptible of determination by summary judgment, and were thus reserved for determination by trial; and certain issues presented by the pleadings were not deemed by the Court to be submitted for the purposes of summary judgment and thus remained for determination at a later date.[1]

As stated, the October 13, 2005 order specifically delineated issues deemed by the Court to be presented to it by the pleadings, and that order carved out cer-tain of those issues for disposition other than by means of the summary judgment mechanism. Subsequently, pursuant to di-rection of the Court, on May 5, 2006, the Trustee filed his Plaintiff's Statement of Claims—Issues for Trial, by which the

---

1. Of course, because even the determinations made by the Court under Fed.R.Bankr.P. 7056/Fed.R.Civ.P. 56 determined fewer than all of the claims presented in this adversary proceeding as to all of the parties, the Octo-ber 13, 2005 order was interlocutory in na-ture; Fed.R.Bankr.P. 7054(a)/Fed.R.Civ.P. 54(b).

Trustee—again, pursuant to the Court's direction—limited the focus of the issues presented in his pleadings to those which he intended to pursue in arriving at a final determination of this adversary proceeding. Without delineation of every possible issue arising in the Trustee's pleadings which may have been sought to be asserted, or was in fact asserted, the issues presented to the Court for final determination, and for final judgment, in this adversary proceeding are those designated in the October 13, 2005 order and in the Plaintiff's Statement of Claims—Issues for Trial. The Court determines that any and all other issues arising under the Trustee's pleadings have been effectively withdrawn by the Trustee from this adversary proceeding, and that no further determination of any of those issues need be made by the Court. Included among those issues are *any and all claims* asserted by the Trustee against the defendants Dorothy L. Wallace in her capacity as Personal Representative of the Estate of Darrell E. Shults, deceased and as his sole heir; any and all claims asserted against First National Business Group, Inc.; and any and all claims asserted against First Financial Mortgage, Inc. The Trustee shall take nothing by way of his complaint against these designated party defendants.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157, and N.D.Ind. L.R. 200.1(a) of the Rules of the United States District Court for the Northern District of Indiana. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F) and (H).

This Memorandum and Decision constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052/ Fed.R.Civ.P. 52(a). The record before the Court for the purposes of final determination is comprised of the summary judgment record designated by the Court on pages 12–19 of its Memorandum of Decision on Cross–Motions for Summary Judgment entered on October 13, 2005, and the additional record provided by means of the trial to the bench held on August 16 and 17, 2006.

## DETERMINATION OF ISSUES PRESENTED TO THE COURT

In view of the convoluted nature of the issues presented to the Court and the manner of their presentation over six years of litigation, the format adopted by this memorandum with respect to Fed. R.Bankr.P. 7052/Fed.R.Civ.P. 52(a) will be to specifically designate each issue submitted to the Court for determination, and under that issue separately state the factual determinations and legal conclusions deemed necessary by the Court to resolve each issue. This will inevitably generate a lengthy decision, and parts of it will be redundant of the determinations made in the October 13, 2005 order; however, in order to effectively state a final judgment, that redundancy is deemed by the Court to be necessary. The format of this determination will essentially follow the outline of issues addressed to specific items of property/ transactions utilized by the Court in the October 13, 2005 order, with the addition of issues presented to the Court which were not determined by that order.

The issues arising under the October 13, 2005 order are the following:

1. 11 U.S.C. § 548(a)(1)(A) [actual fraud];

2. 11 U.S.C. § 548(a)(1)(B) [constructive fraud];

3. 11 U.S.C. § 544(b)(1):

 a. Under §§ 14 and 15 of the Indiana Uniform Fraudulent Transfers Act;

b. Breach of fiduciary responsibility owed by a corporate officer to the corporation;

c. Piercing the corporate veil to impose personal liability on an officer of the corporation, or upon a third person;

d. Personal liability of a corporate officer for acts engaged in by that person in the context of the business of a corporation.

with respect to the following "items":

1. $151,273.90 proceeds received by Dorothy Wallace as the beneficiary of Kemper Zurich policy "644";

2. $795 of premiums paid by the Debtor with respect to Kemper Zurich policy "646";12

3. $1024 of premiums paid by the Debtor with respect to "New York Life" policy;

4. $8068.97 of premiums paid by the Debtor with respect to Valley Forge Policy "ARC";

5. $8068.97 of premiums paid by the Debtor with respect to Valley Forge Policy "TRC";

6. $1200 of premiums paid by the Debtor with respect to Mutual Group Life Insurance;

7. $1023.86 of expenses charged by Wallace for an alleged personal vacation to the Debtor's GE Capital credit card account;

With respect to $305,000 of unpaid investments made in the debtor by persons to whom the Debtor made unfulfillable promises to repay, the Trustee asserts the following theories of recovery under 11 U.S.C. § 544(b)(1):

1. Breach of fiduciary responsibility owed by a corporate officer to the corporation;

2. Piercing the corporate veil to impose personal liability on an officer of the corporation, or upon a third person;

3. Personal liability of a corporate officer for acts engaged in by that person in the context of the business of a corporation.

In addition to the foregoing issues, the following issues were presented to the Court and are hereby determined pursuant to the Plaintiff's Statement of Claims—Issues for Trial:

A. Trustee's Claim v. Dorothy Wallace for Contribution; Liability for Investment Note Holders, as stated on pages 2–5 of the foregoing document;

B. Preference Payments, as stated on pages 5–6 of the foregoing document; [2]

C. Claim against Elmer Shults for transferee liability, as designated on page 6 of the foregoing document; and

D. Claim for pre-judgment interest, as designated on page 7 of the foregoing document.

For the purposes of the final judgment determination effected by this document, the record includes the factual determinations made by the Court in its October 13, 2005 order, as follows:

**2.** The evidence submitted into the record does not sustain these assertions. Moreover, the Trustee omitted any reference to this claim in the "Findings of Fact and Conclusions of Law" which he submitted to the Court, pursuant to the Court's order, on October 4, 2006. The Court finds that the Trustee has chosen to abandon the preferential transfer contentions as a theory of liability in this case; that the record does not sustain any theory so advanced by the Trustee; and that judgment should be entered against the Trustee on any theory of avoidance of preferential transfers under 11 U.S.C. § 547 with respect to the defendant Dorothy Wallace.

1. The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 30, 1999 [Court's record].

2. Kenneth A. Manning is the duly appointed and acting Chapter 7 Trustee of Debtor's Chapter 7 bankruptcy estate [Court's record].

3. Debtor was an Indiana corporation; Darrell was its 100% shareholder, a director, and its President. [Plaintiff's Statement of Material Facts ¶ 3; complaint ¶¶ 6 & 7; Wallace's answer ¶¶ 6 & 7; Elmer's answer ¶¶ 6 & 7].

4. Debtor was established to conduct transactions relating to finance and financial consulting. [Trustee's exhibit 8—Articles of Incorporation].

5. Debtor solicited monies and funds for investment opportunities from individuals by way of telemarketing/advertisements. Responding individuals received Investment Note Certificates; [Trustee's Stat. of Mat. Facts ¶ 48, and materials of record cited therein].

6. Between the years of 1996 and 1999, a total of 33 Investment Note Certificates were issued by the Debtor; the Debtor received a total of $310,000.00 from the persons to whom it issued Investment Note Certificates. Investors responding to the advertisements received Investment Note Certificates, and a Prospectus dated either July 8, 1996 or August 1, 1997. [Trustee's Stat. of Mat. Facts ¶ 50 & 52, and materials of record cited therein].

7. Each of the Investment Note Certificates was signed by Darrell E. Shults as President and by Dorothy L. Wallace as Secretary; [Trustee's Stat. of Mat. Facts ¶ 49 & 52, and materials of record cited therein].

8. One investment note was paid at maturity in the amount of $5,000.00.

[Trustee's Stat. of Mat. Facts ¶ 51, and materials of record cited therein].

9. Investment Note Certificate holders were owed a total of $305,000.00, plus accumulated interest of $44,532.97, on the date of the commencement of this case. [Trustee's Stat. of Mat. Facts ¶ 54, and materials of record cited therein].

10. Recipients of the Investment Note Certificates each received a Prospectus dated either July 8, 1996 or August 1, 1997. In the Paragraph designated as "Reliance on Management" on page 4 of this document, the document states:

**Reliance on Management.** The success of the Company's operations depend, to a large extent, upon the management, lending, credit, analysis and business skills of the senior level management of the Company. If members of senior level management were for some reason unable to perform their duties or were, for any reason, to leave the Company, there can be no assurance that the Company would be able to find capable replacements. The Company currently has employment agreements with Darrell E. Shults, the Company's President and Chief Executive Officer, and Dorothy L. Wallace, the Company's Secretary–Treasurer, but currently not with its other executive officers. The Company does not hold "key-man" insurance for its executive officers other than Darrell E. Shults and Dorothy L. Wallace.

[Trustee's Stat. of Mat. Facts ¶ 50 & 52, and materials of record cited therein].

11. Wallace was a live-in companion and fiance of Darrell. [complaint ¶ 9; Wallace's answer ¶ 9; Elmer's answer ¶ 9; Trustee's Stat. of Mat. Facts ¶ 4], Investors responding to the advertisements received Investment Note Certificates, and a Prospectus dated either July 8, 1996 or August 1, 1997. [Trustee's Stat. of Mat.

Facts ¶ 50 & 52, and materials of record cited therein].

12. On March 21, 1997, Debtor applied for a life insurance policy (# FK2379644) with Zurich Kemper Life Insurance ("Kemper Policy 644") in the amount of $250.000.00, of which Debtor was the owner and sole beneficiary. [Trustee's Stat. of Mat. Facts ¶¶ 12 and 13], Investors responding to the advertisements received Investment Note Certificates, and a Prospectus dated either July 8, 1996 or August 1, 1997. [Trustee's Stat. of Mat. Facts ¶ 50 & 52, and materials of record cited therein].

a. The premiums for this policy were $265.00 [3] per year; the Debtor made the premium payments in this amount on March 20 of 1997, 1998, and 1999; [Trustee's Stat. of Mat. Facts ¶ 14], Investors responding to the advertisements received Investment Note Certificates, and a Prospectus dated either July 8, 1996 or August 1, 1997. [Trustee's Stat. of Mat. Facts ¶ 50 & 52, and materials of record cited therein; Wallace's response pg. 7].

b. On April 8, 1999, as President of the Debtor, Darrell assigned and transferred ownership of this policy to himself, and contemporaneously changed the beneficiary from the Debtor as 100% beneficiary, to Wallace (60%) and Debtor (40%). [Trustee's Stat. of Mat. Facts ¶¶ 15 and 16, and materials of record cited therein; Wallace response pg. 7].

c. On June 7, 1999, Kemper paid Wallace $151,273.90 as a death benefit under this policy arising from Darrell's death [complaint ¶ 26; Wallace's answer ¶ 26; Trustee's Statement of Material Facts, ¶ 17, and materials of record cited therein].

d. As a 40% beneficiary, Debtor received $100,849.27. [Trustee's Summary of Mat. Facts pg. 13; Trustee's Ex. 11].

13. On January 31, 1997,[4] Darrell applied for a life insurance policy from Kemper (# FK2379646) [Kemper policy 646], with respect to which Darrell was the owner and insured, and with respect to which Wallace was the primary beneficiary. [Trustee's Stat. of Mat. Facts ¶ 19, and materials of record cited therein; Wallace's response pg. 8].

a. The premiums for this policy were $265.00 [5] per year; the Debtor made the premium payments in this amount on March 20 of 1997, 1998 and 1999; [Trustee's Stat. of Mat. Facts ¶ 20, and materials of record cited therein; Wallace's response pg. 8].

b. On June 3, 1999, Kemper paid Wallace $252,123.17 as the death benefit under this policy arising from Darrell's death. [complaint ¶ 28; Wallace's answer ¶ 28; Trustee's Stat. of Mat. Facts ¶ 21, and materials of record cited therein].

---

3. Wallace, on pg. 9 of her motion for summary judgment states that "evidence shows that there was *$765* over a three year period paid by FFA on each policy." The Court deems the $765 to be a numerical error, as the correct amount is *$795*.

4. There is a disparity as to the date that this policy was issued. Trustee's Stat. of Mat. Facts ¶ 19 and Wallace's Answer to Interrogatories # 8 state the date of January 31, 1997. Wallace's response pg. 8 and Affidavit of Letitla Nelson ¶ 3 state the date of March 20, 1997. It appears to the Court, from Trustee's

Exhibit # 12, that the policy was applied for on January 31, 1997 and issued on March 20, 1997. This inconsistency is irrelevant for the purposes of this decision.

5. Trustee on pg. 22 of his Legal Memorandum in Support of Plaintiff's Motion for Summary Judgment states that $666.25 in premiums were paid on this policy. The Court cannot tell how this number was calculated. An affidavit of Letitia Nelson, Marked as Trustee's Exhibit 12, states that three premiums of $265.00 were paid, totaling $795.00.

14. On January 31, 1997, Wallace applied for a life insurance policy from CNA—Valley Forge Life Insurance Company ("CNA") (# TRCI000071); Wallace was the owner and insured with respect to this policy, and Darrell was the designated beneficiary; [Trustee's Stat. of Mat. Facts ¶ 22, and materials of record cited therein].

a. The Debtor paid all four (4) premiums on this policy from its corporate bank account: June 9, 1997 in the amount of $3,932.25, May 4th and September 23, 1998—in the amount of $1,034.18 and $2,068.36 respectively, and February 9, 1999 in the amount of $3,932.25. The premiums totaled $8,068.97.[6] [complaint ¶ 31(b); Elmer's answer ¶ 31; Trustee's Stat. of Mat. Facts ¶ 23, and materials of record cited therein].

15. On January 31, 1997, Wallace applied for a life insurance policy from Valley Forge Life Insurance Company ("CNA") (# TRCI000028); Wallace was the owner and the insured with respect to this policy, and the Debtor was named the beneficiary. [Trustee's Ex. 18].

a. The Debtor paid all four (4) premiums on this policy from its corporate bank account: June 3, 1997 in the amount of $3,932.25, May 4th and September 23, 1998—in the amount of $1,034.18 and $2,068.36 respectively, and February 9, 1999 in the amount of $1,034.18. The premiums totaled $8,068.97. [complaint ¶ 31(a.); Elmer's answer ¶ 31; Trustee's Legal Memorandum in Support of Plaintiff's Motion for Summary Judgment, pg. 22].

16. On February 14, 1997, New York Life Insurance Company ("NYLIC") issued a life insurance policy (# A0328853) to Wallace, upon her application made on January 29, 1997. Wallace was the owner and insured with respect to this policy, and Darrell was the designated beneficiary; [Trustee's Stat. of Mat. Facts ¶ 25, and materials of record cited therein].

a. The Debtor paid all three (3) premiums on this policy from its corporate bank account: January 29,997 in the amount of $350.00, March 2, 1998 in the amount of $334.20, and February 9, 1999 in the amount of $340.20. [complaint ¶ 31(b); Elmer's answer ¶ 31; Trustee's Stat. of Mat. Facts ¶ 26, and materials of record cited therein].

17. Debtor was the owner and Plan holder of Principal Life Insurance Company group health and life policy # N3505–4716 ("Principal Life"). Darrell was an employee plan member under this policy, and Wallace was the beneficiary. [Trustee's Stat. of Mat. Facts ¶ 27, 28, & 31, and materials of record cited therein].

a. On April 12, 1999, Darrell Shults, as an officer of the Debtor, withdrew $3500 cash from the Debtor's corporate bank account by means of a check; [Trustee's Stat. of Mat. Facts ¶ 29, and materials of record cited therein].

b. On April 12, 1999, Darrell Shults obtained a cashier's check, by payment in cash, from NBD Bank, payable to Principal Life Insurance Company in the amount of $1200.00, as payment for the premium on policy # N3505–4716; [Trustee's Stat. of Mat. Facts ¶ 30, and materials of record cited therein; Wallace's response pg. 8].[7]

---

6. Trustee on pg. 22 of his Legal Memorandum in Support of Plaintiff's Motion for Summary Judgment states that $8,136.72 in premiums were paid on this policy. The Court cannot tell how this number was calculated in light of Trustee's Exhibit 19, which depicts that the total amount of premiums paid on this policy was $8,068.97. The Court deems the figure of $8,068.97 to be the correct amount.

7. While there is a permissible inference that Darrell used a portion of the cash withdrawn from the corporate account to purchase the cashier's check used to pay the premium on

c. On August 1, 1999, Wallace received $100,000. as the death benefit under the foregoing policy as a result of Darrell's death; [Trustee's Stat. Of Mat. Facts ¶ 31 and materials of record cited therein].

18. On December 11, 1998, a G.E. Capital Financial Visa Credit Card ("GE Capital") was issued to Debtor; [Trustee's Stat. of Mat. Facts ¶ 44, and materials of record cited therein].

19. During April 1999, Wallace traveled to Tampa, Florida on a personal trip, unrelated to the Debtor's business, and made use of the Debtor's GE Capital credit card, charging the sum of $1,032.86. [Trustee's Stat. of Mat. Facts ¶¶ 45 & 46, and materials of record cited therein]. Wallace has never reimbursed the Debtor for these charges; [Trustee's Stat. Of Mat. Facts ¶ 47, and materials of record cited therein].

20. In Trustee's Ex. 23—Affidavit of Kenneth A. Manning Financial Records/Tax Returns, materials concerning the Debtor's alleged "insolvency" with reference to the definition of "insolvent" stated in 11 U.S.C. § 101(32) have been placed in the record. Paragraph "7X" of Trustee's exhibit is a Net Worth Report as of April 25, 1999. It shows that the Debtor had a negative balance of $344,309.07. A Cash Flow Report for the period of January 1, 1999 through April 25, 1999 shows a negative cash flow of $99.62. ¶ 7W. A Profit and Loss Statement covering the same period shows a negative balance of $40,218.17. ¶ 7V. A Balance Sheet shows that as of April 25, 1999, the Debtor was in the red for $14,019.43. ¶ 7U.

The Debtor's financial situation was not better during the year of 1998. A Cash Flow Report shows a negative balance of $4,471.40. ¶ 7T. A Profit & Loss Statement for the same year shows a negative flow of $105,351.49. ¶ 7S. A Balance Sheet figure as of December 31, 1998 shows a negative balance of $14,119.05. ¶ 7R.

The year of 1997 was also full of losses. A Profit & Loss Statement for the whole year shows a negative balance of $88,700.87. ¶ 7Q. A Cash Flow Report covering the year of 1996 shows a negative balance of $3,077.73. ¶ 7P. A 1995 Cash Flow Report shows a positive balance of $9,017.18. ¶ 7O. The Cash Flow Report for 1994 also shows the Debtor being in the dark for $2,216.02. ¶ 7N. For a summary see Trustee's Ex. 23—Facts/Insolvency chart and a Notes to Solvency Chart.[8]

The Court's Findings of Fact and Conclusions of Law are as follows:

## I. Kemper Policy 644—$151,273.90

The Trustee, by utilizing his powers under § 548, § 544 and IC 32–18–2–1 et. seq., attempts to recover from Wallace, in her

---

this policy, it is only an inference. In her response to ¶ 15 of the Trustee's Request for Admissions [Trustee's Exhibit 4], Wallace stated that from her review of documents "[i]t appears that Darrell may have gotten this money from a VISA Loan Advance from my [Wallace's] Credit Union account." For the purposes of the Trustee's motion for summary judgment, all inferences were resolved against him. For the purpose of Wallace's cross-motion for summary judgment, all inferences were resolved against her. The final determination regarding the Trustee's action is stated infra.

8. Based upon the materials referenced in paragraphs 6, 10 and 21—and the additional record materials before the Court pursuant to paragraphs 55, 56, 57, 58, 59 and 60 of the Trustee's "Plaintiff's Statement of Material Facts" filed on October 31, 2003, and materials of record cited therein—the Court finds that the Debtor was "insolvent" within the definition provided by 11 U.S.C. § 101(32) at all times relevant to this decision during the years 1997, 1998 and 1999.

individual capacity and as an officer and fiduciary of the Debtor corporation, a death benefit disbursement received by her. The allegations upon which this claim is based stem from the facts and circumstances which led to Wallace's receipt of a disbursement from a life insurance policy originally purchased by the Debtor, of which the Debtor was the owner, and with respect to which the Debtor was the 100% beneficiary. More particularly, the Trustee alleges that his recovery is based on the fact that five days prior to committing suicide, Darrell, the president of the Debtor corporation, changed the ownership of this life insurance policy from the Debtor to himself and contemporaneously changed the beneficiary of the policy from solely the Debtor to 40% Debtor and 60% Wallace. About two months after Darrell's death on April 13, 1999, on June 7, 1999, Wallace received her 60% share of the value of the policy, $151,273.90.

### 11 U.S.C. § 548(a)(1)(A)

11 U.S.C. § 548(a)(1)(A), as applicable to this adversary proceeding, provides:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

■ The burden of proving a fraudulent transfer under § 548 is on the Trustee. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002).

■ The cause of action under *§ 548(a)(1)(A)* requires the Trustee to establish the Debtor's actual intention to hinder, delay, or defraud creditors; *In re FBN Food Serv., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996), *In re Scott*, 227 B.R. 834, 843 (Bankr.S.D.Ind.1998). Debtor's actual intent to defraud under § 548(a)(1)(A) can be established or inferred by offering of proof on various "badges of fraud". They include the following:

> (1) absconding with the proceeds of the transfer immediately after their receipt; (2) absence of consideration when the transferor and transferee know that outstanding creditors will not be paid; (3) huge disparity in value between the property transferred and the consideration received; (4) fact that the transferee was an officer, or agent or creditor of an officer of corporate transferor; (5) insolvency of the debtor; and (6) existence of a special relationship between the debtor and the transferee. *Carmel v. River Bank Am. (In re FBN Food Servs., Inc.)*, 175 B.R. 671 (Bankr. N.D.Ill.1994), *aff'd*, 185 B.R. 265, 275 (N.D.Ill.1995), *aff'd*, 82 F.3d 1387 (7th Cir.1996). Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor. *Id.* 185 B.R. at 275 (transactions with insiders must be rigorously scrutinized).

*In re H. King & Associates*, 295 B.R. 246, 283 (Bankr.N.D.Ill.2003).

■ Before the Court goes any further, it must first be stated that this claim stems from actions of the president of the Debtor corporation, Darrell Shults. Many courts have held that in the context of a corporate debtor, courts may look into the fraudulent intent of its controlling members. *General Search*, 322 B.R. at 842, citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir.1983).

*See also Armstrong v. Ketterling (In re Anchorage Marina, Inc.),* 93 B.R. 686, 691 (Bankr.D.N.D.1988) ("In cases such as this one in which the Debtor is a corporation the intent of the controlling officers and directors is presumed to be the Debtor's intent.") (citation omitted). Thus, for purposes of this cause of action, the Court will consider the actions of Darrell, who was the founder, 100% shareholder, director and President, of the Debtor.

The Trustee argues that the Debtor acted fraudulently when Darrell changed the ownership of Kemper Policy 644 from Debtor to himself and then contemporaneously changed the beneficiary of that life insurance policy from 100% Debtor, to 40% Debtor and 60% Wallace, just five days before his death by suicide. Wallace, in her attempt to negate any liability on her part, states that the Trustee cannot avoid and recover from her the $151,273.90 (money Wallace received after Darrell committed suicide) because at the time Darrell made the change in ownership and beneficiaries, the policy had no cash value; [Transcript of March 17, 2005 hearing, at 37, 44]. Thus, according to Wallace, the change of beneficiaries here had no impact on either the Debtor or its creditors. *Id.* at 43.

■ The threshold issue is the identification of the "interest of the debtor in property" under § 548(a) implicated in the Debtor's transfer, by and through Darrell, in relation to Kemper Policy 644 *under the circumstances of this case.* As established by the Supreme Court in *Begier v. Internal Revenue Service,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), interests of a debtor in property for the purpose of analysis under provisions of the Bankruptcy Code is not strictly a question of state law, but also requires reference to the intent of Congress in the use of the term "property" in various provisions of the Code. In *Begier,* the Court stated:

> The Bankruptcy Code does not define 'property of the debtor.' Because the purpose of the avoidance provision [in *Begier* 11 U.S.C. § 547(b) ] is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.

110 S.Ct. at 2263.

■ What then would have been property of the Debtor's estate had the transfer of ownership and change of beneficiary of Kemper Policy 644 not been made? Clearly, the 100% death benefit proceeds would have been, including that part of those benefits received by Wallace as a result of the transfer. The facts of this case are unique, but not difficult to sort out. Without any reasonable inference in this record to the contrary, at the time Darrell Shults changed the ownership and beneficiary on the policy, he *knew* that he was going to take his life, and *he knew* that his actions in transferring the policy and in changing the beneficiary would deprive the Debtor of funds necessary to pay its obligations to the corporation's creditors. Knowing, as he clearly did, that his death would result in a payment of $250,000 to someone, the actions of Darrell in relation to the policy were tantamount to the transfer of 60% of the policy benefits to other than the corporation's creditors, just as if the corporation had had $250,000 in a bank account, and he had transferred 60% of the account to Wallace immediately prior to his committing suicide. Under the circumstances, the transfer effected by Darrell by changing the ownership of Kemper Pol-

icy 644 and then changing the beneficiary was the equivalent of transferring $151,273.90 to Wallace. Thus, given Darrell's total control over the triggering mechanism for payment of the policy's benefits, and his obvious intent to exercise that control by causing the payment of the benefit by his act of suicide, the "interest of the debtor in property" transferred, under the unique circumstances of this case, was the 60% of the full death benefit payable under the policy which was effected by the change of beneficiary to Wallace.[9]

· As stated, the Court does not deem state law to be completely controlling in the context of the Trustee's action under § 548(a)(1)(A). To the extent Indiana law bears on this issue at all, detailed review of the Indiana cases did not provide the Court with a precise answer to the issue at bar.

The case of *Metropolitan Life Insurance Co. v. Tallent*, 445 N.E.2d 990 (Ind. 1983), a case which was certified to the Indiana Supreme Court by the Seventh Circuit Court of Appeals, is not on point. In *Tallent*, the issue of contention was "whether an insured may change the designation of beneficiary of a group life insurance policy during the pendency of a marriage dissolution proceeding in which a temporary restraining order, which restrains the insured from 'transferring ... or in any way disposing or any property except in the usual course of business or for the necessities of life', is in effect." 445 N.E.2d at 991. The entire case hinges upon the definition of "property" under I.C. 31–1–11.5–2 in the context of whether the change of beneficiary with respect to a term life insurance policy by a husband in a dissolution of marriage action prior to his committing suicide, violates the terms of a predissolution restraining order under that statute. The court held that where an insurance policy has no surrender value, it is excluded from the definition of property within the statutory ambit. *Id.* The determination of the scope of "property" under I.C. 31–1–11.5–2 has no bearing on the scope of "interest of the debtor in property" under 11 U.S.C. § 548(a)(1).

The case of *State v. Tomlinson*, 16 Ind. App. 662, 45 N.E. 1116 (1897) is equally inapposite. In *Tomlinson* the court mentioned in passing that a last minute change in beneficiary may be subject to the claims of creditors to avoid a transfer made in fraud of their rights, if an intent to defraud could be found. 45 N.E. at 1121. But in *Tomlinson*, the decedent, who had changed the beneficiary of a life insurance on the eve of his death from his estate to his wife, died of natural causes. The court wrote:

> The law favors the making of reasonable provision by a man for his dependent family, and in *Johnson v. Alexander*, 125 Ind. 575, 25 N.E. 706, the supreme court of Indiana has said: "It is not a violation of the statute, and in fraud of creditors, for a debtor, though insolvent, to contribute and pay a reasonable amount for insurance for the benefit of his family." In *Pence v. Makepeace*, 65 Ind. 345[, 1879 WL 5483 (1879)], it is held that only on the clearest proof of fraud, if at all, can the premiums paid by an insolvent debtor on a policy of insurance on his life for the benefit of his wife and children be revoked by his creditors, and in no event can any excess over the

---

9. This result is additionally underscored by the fact that the Debtor's Prospectus had represented that "key-man" insurance was held by the corporation with respect to Darrell, and thus that the proceeds of that policy— Kemper policy 644—were viewed and understood by Darrell to be an asset of the Debtor upon which creditors of the corporation could rely in the event of his death, or should have been so viewed.

amount of the premium so paid be recovered.

*Id.*

The *Tomlinson* case is entirely distinguishable not only because it did not involve a suicide by which the owner of the policy controlled the payment of benefits and orchestrated the payment of benefits to his intent to direct the policy proceeds, but also because the transfer of beneficiary benefitted the transferor's wife and children; here the transfer was not made for the benefit of family members, but was for the benefit of Wallace, the fiancé of the Debtor's president, Darrell.

In *Johnson v. Alexander,* 125 Ind. 575, 25 N.E. 706 (Ind.1890), shortly before his death (again not by a suicidal act), Alexander transferred a portion of his policy to certain of his creditors to secure his indebtedness to those creditors. The family of Alexander asserted a claim to the balance of the life insurance not assigned to the creditor, to the detriment of other creditors of the decedent. As in *Tomlinson,* the *Alexander* court cited *Makepeace* 75 Ind. 485, 1881 WL 6539 (1881) for its holding that "only to the clearest proof of fraud, if at all, can the premiums paid by an insolvent debtor on a policy of insurance upon his life, for the benefit of his wife and children, be recovered by his creditors; and in no event can any excess over the amount of the premiums so paid be recovered." *Id.* at 707. This case does not involve a suicidal act, and thus in the Court's view its pronouncement that recovery is limited to premiums paid for a life insurance policy is not applicable to this case.

Under the circumstances of this case, the "interest of the debtor in property" transferred by the Debtor, by Darrell's acts, was the 60% interest in the **proceeds** of Kemper Policy 644 generated by Darrell's act of suicide.

■ The Court finds that the Debtor acted with an actual intent to hinder, delay or defraud its creditors when Darrell transferred the ownership of, and changed the beneficiaries with respect to, Kemper Policy 644. Darrell, knowing of his imminent demise, and knowing that the assets of the corporation without 100% of the policy proceeds could not possibly satisfy the indebtedness owed to the Certificate holders [10] and the Prospectus' promise of "key-man" insurance on his life—intentionally diverted assets of the Debtor which would be created by his intended death to other than the corporation's creditors. Thus, under the "badges of fraud" analysis of *In re King & Associates,* supra., there was a total lack of consideration from Wallace under circumstances in which at least Darrell knew that creditors wouldn't be paid; there was a huge disparity in value between the amount transferred to Wallace (60% of the policy proceeds) and the consideration given by Wallace for the transfer (0); while perhaps not a "functioning" officer of the Debtor, it is beyond question that Wallace was an officer of the Debtor, at the very least by representations made by the Debtor to third parties; the Debtor was insolvent when the transfer was made; and there was a special relationship between the Debtor (in essence Darrell) and the transferee Wallace. More to the point, the record establishes that Darrell intended to disadvantage the corporation's creditors by placing 60% of the proceeds of Kemper Policy 644 into the hands of Wallace when he took his own life. Wallace's argument that the Debtor's

10. It must also be noted that the amount of the policy ($250,000) in full was still less than the amount of the "investments" made by Certificate holders ($310,000), even given that one $5000. "investor" had been paid in full prior to Darrell's death.

creditors were not harmed is simply a warrantless assertion.

The Trustee relies extensively on the case of *In re Wolensky's Ltd. P'ship.*, 163 B.R. 615 (Bankr.D.D.C.1993). The Court does not deem that case to be as "on point" as does the Trustee; although a suicide by a partner who changed the beneficiary on a life insurance policy payable to the partnership for the benefit of its creditor was involved, the principal issues in the case were the deceased partner's authority to make the change of beneficiary on behalf of the partnership, and the ultimate beneficiary's entitlement to an exemption with respect to the policy proceeds. The Court did not determine whether the "transfer" involved a fraudulent conveyance, but merely on that issue denied the defendant's motion to dismiss on the assertion that it did not.

The Court determines that the Trustee is entitled to judgment on his claim under 11 U.S.C. § 548(a)(1)(A) for avoidance of the transfer of $151,273.90 as the proceeds of Kemper Policy 644, and that he is entitled to judgment against Wallace in that amount pursuant to 11 U.S.C. § 550(a)(1).

***11 U.S.C. § 548(a)(1)(B)***

■ In order to avoid this transfer, the Trustee utilizes both the actual fraud [§ 548(a)(1)(A)] and the constructive fraud [§ 548(a)(1)(B)] provisions of § 548. *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1235–36 (7th Cir.1990).

11 U.S.C. § 548(a)(1)(B), as applicable to this adversary proceeding, states:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . .

> **(B)(I)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> **(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> **(II)** was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>
> **(III)** intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

■ The Court finds that the Trustee has also demonstrated that the change in ownership and beneficiary of Kemper Policy 644 was a fraudulent transfer within the purview of § 548(a)(1)(B). The *General Search* court stated the requisite proof under § 548(a)(1)(B):

> The cause of action under § 548(a)(1)(B) is often referred to as "constructive fraud" because it omits any element of intent. *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996). In order for a trustee to establish a fraudulent conveyance under § 548(a)(1)(B), he must prove the following elements: (1) a transfer of the debtor's property or interest therein; (2) made within one year of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) either (a) the debtor was insolvent when the transfer was made or was rendered insolvent thereby; or (b) the debtor was engaged or about to become engaged in a business or a transaction for which its remaining property represented an un-

reasonably small capital; or (c) the debtor intended to incur debts beyond its ability to repay them as they matured. *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir.1999); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 505 (N.D.Ill. 1988); *Barber v. Dunbar (In re Dunbar)*, 313 B.R. 430, 434 (Bankr.C.D.Ill. 2004). The trustee must prove each element by a preponderance of the evidence. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 (Bankr.N.D.Ill.2005).

*In re General Search.com*, 322 B.R. 836, 842 (Bankr.N.D.Ill.2005). See also *Kisak*, 192 F.3d at 1109.

First, there was a transfer of the policy proceeds, as addressed above; See, *In re John Hatton, Inc.*, 104 B.R. 705, 707 (Bankr.W.D.Pa.1989) [a change of a beneficiary is a transfer]. Second, the Debtor received less than a reasonably equivalent value in exchange for the transfer; this fact is not in dispute as both parties agree that Wallace gave nothing of value in exchange for the transfer. Third, the transfer was made within one year of the filing of the bankruptcy petition.

Fourth, the Debtor was insolvent when the transfer was made or was rendered insolvent by the transfer. Wallace, in her multiple briefs, did not contravene the Trustee's assertions that the Debtor was insolvent. Only when questioned by the Court during a hearing held on March 17, 2005, did Wallace's attorney express his view that the Debtor was not or might not have been solvent. Wallace has submitted no evidence in support of this view.

 The requirement of the Debtor's insolvency was addressed in detail in *General Search.com*. There, the Court stated:

The Code employs a balance sheet approach to the question of insolvency.

*Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs, Ltd.)*, 147 B.R. 140, 154 (Bankr.N.D.Ill.1992). Specifically, section 101(32) of the Code defines "insolvent" and states in relevant part that:

"insolvent" means—

(A) with reference to an entity … financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A) (2005). The Seventh Circuit has interpreted this definition to require courts to determine what a willing buyer would pay for the debtor's entire package of assets and liabilities. *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992). If the price is positive, the debtor is solvent; if the price is negative, the debtor is insolvent. *Id.* A trustee may utilize appropriate means to prove insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence. *Freeland v. Enodis Corp. (In re Consolidated Indus. Corp.)*, 292 B.R. 354, 360 (N.D.Ind.2002).

322 B.R. at 848–49. *See also Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir.2002) ["when a person transfers money or property to another person without receiving anything in return, and the transferor is insolvent (or made insolvent by the transfer), the transfer is voidable even if there was no intent to hinder creditors."].

With the foregoing principles in mind, the Court's inquiry into the Debtor's solvency begins. The question which the Court must determine under § 548(a)(1)(B)(ii)(I) is "what would a buyer be willing to pay for the debtors entire package of assets and liabilities?" *Covey*, 960 F.2d at 660; *Matter of Xonics Photochemical*, 841 F.2d at 199; *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166 (7th Cir.1990). The Trustee argues that the Debtor's own financial statements show it to be insolvent. Trustee's Ex. 23—Affidavit of Kenneth A. Manning Financial Records/Tax Returns. Paragraph "7X" of Trustee's exhibit is a Net Worth Report as of April 25, 1999. It shows that the Debtor had a negative balance of $344,309.07. A Cash Flow Report for the period of January 1, 1999 through April 25, 1999 shows a negative cash flow of $99.62. ¶ 7W. A Profit and Loss Statement covering the same period shows a negative balance of $40,218.17. ¶ 7V. A Balance Sheet shows that as of April 25, 1999, the Debtor was in the dark for $14,019.43. ¶ 7U.

The Debtor's financial situation was not better during the year of 1998. A Cash Flow Report shows a negative balance of $4,471.40. ¶ 7T. A Profit & Loss Statement for the same year shows a negative flow of $105,351.49. ¶ 7S. A Balance Sheet figure as of December 31, 1998 shows a negative balance of $14,119.05. ¶ 7R.

The year of 1997 was also full of losses. A Profit & Loss Statement for the whole year shows a negative balance of $88,700.87. ¶ 7Q. A Cash Flow Report covering the year of 1996 shows a negative balance of $3,077.73. ¶ 7P. A 1995 Cash Flow Report shows a positive balance of $9,017.18. ¶ 7O. The Cash Flow Report for 1994 also shows the Debtor being in the dark for $2,216.02. ¶ 7N. For a summary see Trustee's Ex. 23—Facts/Insol-vency chart and a Notes to Solvency Chart.

The Trustee argues that it is not necessary to pinpoint the negative balance each and every day, and that courts have no hesitation in applying the princip[le] of "looking back" and retrojection [Trustee's memorandum, pg. 13–14]; *In re Strickland*, 230 B.R. 276, 283 (Bankr.E.D.Va. 1999). The evidence presented by the Trustee—which includes tax returns for the relevant periods, Debtor's Schedules, as well as other financial information—goes far beyond that submitted in *Strickland*. The evidence here shows that the Debtor was under water throughout its operations between 1996 and 1999, each year falling more and more in debt, and that clearly the price a willing buyer would have paid for the Debtor's assets would have been less than the Debtor's liabilities. The Court thus finds that the Debtor was insolvent within the bounds of section 101(32) of the Code at the time the transfer was made.

Wallace has offered nothing to rebut this conclusion. Wallace's counsel, at the March 17, 2005 hearing, acknowledged that "... there is a debt to the corporation, but simply because a struggling business owes money out, does not automatically mean that it's insolvent". Transcript, at 41. Mere speculations or conclusory assertions will not defeat the granting of a summary judgment.

It is also beyond question that the Trustee has established the criteria of subsections (II) and (III) of § 548(a)(1)(B)(ii), as well, based upon the Debtor's financial condition on the date of the transfer, the fact that Darrell's death would eviscerate any business in which the Debtor was engaged [a fact which Darrell knew, obviously], and that the transfer deprived the Debtor of any ability to return the base

investments made by the Certificate holders to them.

The Court determines that the Trustee is entitled to judgment on his claim under 11 U.S.C. § 548(a)(1)(B) for recovery of $151,273.90 as the proceeds of Kemper Policy 644, and that he is entitled to judgment against Wallace in that amount pursuant to 11 U.S.C. § 550(a)(1).

## *11 U.S.C. § 544(b)(1)*

### A. *Uniform Fraudulent Transfer Act*

 The Trustee also contends that this transfer is avoidable by the provisions of Indiana Uniform Fraudulent Transfer Act, I.C. 32–18–2–1 *et seq.* ["UFTA"], through the portal of 11 U.S.C. § 544(b)(1), which states:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

As articulated by the Honorable Robert Grant, Judge of the United States Bankruptcy Court for the Northern District of Indiana:

> Section § 544(b) of the United States Bankruptcy Code gives the bankruptcy trustee the power to "avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim ..." 11 U.S.C. § 544(b)(1). In essence, this provision allows the trustee to take advantage of state law concerning fraudulent conveyances. *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 202 (7th Cir.1988). The result is that "if any unsecured creditor could reach an asset of the debtor outside of bankruptcy, the Trustee can use § 544(b) to obtain that

asset for the estate. As part of the estate, the asset is then divided among all the unsecured creditors ..." *Matter of Leonard*, 125 F.3d 543, 544 (7th Cir. 1997).

Indiana law [FN] recognizes two different types of fraudulent conveyances—those which are actually fraudulent and those which are only constructively so. An "actual fraudulent conveyance" is made with the intent to hinder, delay or delay one's creditors and may be challenged by any creditor regardless of whether their claim arouse before or after the transfer was made. I.C. 32–18–2–14. A "constructively fraudulent conveyance," on the other hand, has nothing to do with the intent or motivation surrounding the transfer. Instead, its fraudulent nature is determined solely by the circumstances of the transaction itself. A transfer is constructively fraudulent if it was made for less than reasonably equivalent value and the debtor was either insolvent at the time or became insolvent as a result of the transfer. I.C. 32–18–2–15. Only creditors existing at the time of the transaction may challenge a transfer as constructively fraudulent. *Id.* In either case though, whether it is actually fraudulent or only constructively so, the transfer may be avoided under Indiana law. [FN 2]. I.C. 32–18–2–17, 18.

> FN 1. Indiana has adopted the Uniform Fraudulent Transfer Act, the UFTA, which has been codified as I.C. 32–18–2 et seq. Much of the UFTA has been derived from the Bankruptcy Code's provisions concerning fraudulent transfers. As a result, the court can look to bankruptcy decisions for guidance concerning what is otherwise a matter of state law.

> FN 2. Given the derivation of the UFTA, it will come as no surprise that

Indiana Law concerning what constitutes a fraudulent conveyance is substantially similar to the provisions of the Bankruptcy Code which give the trustee an independent, federal right to avoid such transfers. See, 11 U.S.C. § 548. The essential difference is that the Bankruptcy Code only allows the trustee to challenge transfers made during the year prior to the petition, 11 U.S.C. § 548(a)(1), while Indiana Law allows the trustee to challenge transfers made four or more years prior to the petition. I.C. 32–18–2–19.

*In re Williams*, Adv. No. 03–1407, pg. 2–3 (Bankr.N.D.Ind.2004)(Grant, J.), *aff'd*, 1:05–cv–00006 (N.D.Ind. July 12, 2005)(Lee, J.), *appeal docketed*, No. 05–3352 (7th Cir. August 12, 2005). See also *In re Myers*, 320 B.R. 667 (Bankr.N.D.Ind. 2005) (Grant, J.).

■ So long as an unsecured creditor exists, the Trustee need not identify the unsecured creditor for § 544(b)(1) purposes. *In re Image Worldwide, Ltd.*, 139 F.3d 574 (7th Cir.1998). The Trustee nevertheless has done that here. The Trustee has identified numerous unsecured creditors, who are for the most part the holders of Investment Notes issued by the Debtor. Two of such creditors are J. Buening and Paul Buening. See March 17, 2005 Hearing Transcript at 8–10 ("Tr.").

■ The burden of proving a fraudulent transfer under the Act is on the Trustee.

The UFTA is analogous to 11 U.S.C. § 548(a)(1). Thus, much of the analysis made above under 11 U.S.C. § 548(a)(1) is applicable here. I.C. 32–18–2–14, which requires actual fraud, states:

14. A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving reasonably equivalent value in exchange for the transferor obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

I.C. 32–18–2–15, which requires the proof of constructive fraud, states:

15. A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation incurred if:

(1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(2) the debtor:

(A) was insolvent at that time; or

(B) became insolvent as a result of the transfer or obligation.

■ In addressing the requirements of proof in a fraudulent conveyance action, the Court in *Creech* wrote:

Fraudulent intent can be inferred from certain indicia called "badges of fraud." *U.S. Marketing Concepts, Inc. v. Don Jacobs Buick–Subaru, Inc.* (1989), Ind. App., 547 N.E.2d 892, 894. Some of the

badges from which fraudulent intent can be inferred include: 1) the transfer of property by a debtor during the pendency of a suit; 2) a transfer of property that renders the debtor insolvent or greatly reduces his estate; 3) a series of contemporaneous transactions which strip the debtor of all property available for execution; 4) secret or hurried transactions not in the usual mode of doing business; 5) any transaction conducted in a manner differing from customary methods; 6) a transaction whereby the debtor retains benefits over the transferred property; 7) little or no consideration in return for the transfer; and 8) a transfer of property between family members. *Id.* When there is a concurrence of several badges of fraud an inference of fraudulent intent may be warranted. *Id.* However, no one badge of fraud constitutes a per se showing of fraudulent intent. *Jones v. Central Nat'l Bank of St. Johns* (1989), Ind.App., 547 N.E.2d 887, 890. Rather, the facts must be taken together to determine how many badges of fraud exist and if together they constitute a pattern of fraudulent intent.

*Lee's Ready Mix and Trucking, Inc. v. Creech,* 660 N.E.2d 1033, 1037 (Ind.Ct.App. 1996). *See also, Greenfield v. Arden Seven Penn Partners, L.P.,* 757 N.E.2d 699, 703 (Ind.Ct.App.2001); *Glentel, Inc. v. Wireless Ventures, LLC,* 362 F.Supp.2d 992, 1006–08 (N.D.Ind.2005).

 The question of fraudulent intent is deemed a question of fact. Lack of consideration alone is not enough to support a charge of fraud. Rather, "fraudulent intent may be inferred from various factors or 'badges of fraud' present in a given transaction ..." *Greenfield,* 757 N.E.2d at 703, citing *Diss v. Agri Bus. Intern., Inc.,* 670 N.E.2d 97, 99–100 (Ind.

Ct.App.1996). Also *U.S. v. Smith,* 950 F.Supp. 1394, 1404 (N.D.Ind.1996).

The totality of the badges of fraud as discussed in *Creech, supra,* lead this Court to the same conclusion reached under § 548(a)(1)(A). Although the transfer here was not made during the pendency of a lawsuit, it nevertheless has the same similarities of a rushed transaction. It was a rushed transaction in light of the timing of Darrell's suicide, which occurred five days later, and in light of Darrell's knowledge then of his intended demise. This was likewise an abnormal transaction in light of the Debtor's normal business activities. Clearly, Darrell intended that his fiancé receive the money instead of the creditors of the Debtor. This transfer also clearly stripped the Debtor of any property that could be distributed to its creditors, most of which are investment note holders. The Debtor also received no consideration for this transfer in light of I.C. 32–18–2–13(a); consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition;[ UFTA § 3 cmt. 2]. Here, no one disputes that no money or other consideration was exchanged for this transfer, and thus the analysis of whether the transfer was made for a "reasonably equivalent value" is unnecessary.

In order to establish that the Debtor made a fraudulent transfer prohibited by the constructive fraud section of the UFTA, the Trustee must show that the Debtor (1) made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) was either insolvent at that time or became insolvent as a result of the transfer or obligation. *See* I.C. 32–18–2–15. *Fire Police City County Fed. Credit Union v. Eagle,* 771 N.E.2d 1188 (Ind.Ct.App.2002). Under the UFTA, a debtor "is insolvent if the sum of the debtor's debts is greater than

all of the debtor's assets at a fair market value." I.C. 32–18–2–12(c). The Debtor's insolvency was discussed *supra,* and it is not necessary to repeat it here.

Taking all the badges of fraud into consideration—See, *Jones v. Cent. Nat'l Bank of St. Johns,* 547 N.E.2d 887, 890 (Ind.Ct. App.1989)—and for the same reasons articulated with respect to § 548(a)(1)(A) and § 548(a)(1)(B), the Court holds that the Trustee established the requisite elements under I.C. 32–18–2–(14) and (15); See, *H. King & Associates,* 295 B.R. at 289.

The Court determines that the Trustee is entitled to judgment on his claim under 11 U.S.C. § 544(b)(1) for recovery of $151,273.90 as the proceeds of Kemper Policy 644, under both I.C. 32–18–2–14 and I.C. 32–18–2–15, and that he is entitled to judgment against Wallace in that amount pursuant to 11 U.S.C. § 550(a)(1).

### 11 U.S.C. § 544(b)(1) Under Corporate Responsible Officer and Fiduciary Theories

The Trustee has advanced theories of recovery against Wallace under 11 U.S.C. § 544(b)(1) on several additional grounds, apart from "piercing the corporate veil" which will be subsequently addressed. Those grounds are:

A. Breach of fiduciary responsibility owed by a corporate officer to the corporation; and

B. Personal liability of a corporate officer for acts engaged in by that person in the context of the business of a corporation.

The Court deems these arguments by the Trustee to be a kind of "catch all, gotta make it, whatever" jab at liability if all else fails—the kind of arguments good lawyers make but don't seriously think are winners. If that's a correct perception, it's a correct perception.

The nature of the duty owed to the corporation by an individual involved in a closely held corporation was defined as follows in *W & W Equip. v. Mink,* Ind.App., 568 N.E.2d 564, 571 (1991):

The nature of the fiduciary duty is the same regardless of whether it arises in the capacity of a director, officer, or shareholder in a close corporation *Hartung v. Architects Hartung/Odle/Burke, Inc.* (1973) 157 Ind.App. 546, 301 N.E.2d 240, *trans. denied.* 'The fiduciary must deal fairly, honestly and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests' *Id.,* 157 Ind.App. at 552, 301 N.E.2d at 243.

Under this theory, the corporation is the wronged party, and the recovery for the acts of the sinning officer inure to the benefit of the corporation directly. The Trustee, as the successor to the Debtor corporation, has a direct cause of action against an officer on this theory, and therefore technically the Trustee's action does not depend upon 11 U.S.C. § 544—which provides the Trustee with the rights of action which could be asserted by a hypothetical creditor or bona fide purchaser [§ 544(a) ], or by an actual creditor holding an unsecured claim [§ 544(b)(1) ]. The Court deems this theory to be more properly assertable under 11 U.S.C. § 542(b), a theory of recovery which the Trustee has not alleged. Thus, with respect to this theory, Wallace is entitled to judgment on the Trustee's claims.

A somewhat similar theory, although one which inures to the benefit of wronged parties who live outside the corporation's gaggle of shareholder/officer/director groupies rather than to the corporation itself, is the concept that corporate officers may be held personally liable for tortious or fraudulent corporate acts in

which they participate [See, e.g., *Indiana Dep't of Transp. v. McEnery,* Ind.App., 737 N.E.2d 799, 802 (2000) ].

 It is also Indiana law that "it is true that a corporate officer or shareholder may not be held liable for acts by the corporation merely because he is an officer or shareholder [citing *Birt v. St. Mary Mercy Hosp. of Gary, Inc.,* (1977), Ind. App., 370 N.E.2d 379, 382]." *American Indep. Mgmt. Sys., Inc. v. McDaniel,* Ind. App., 443 N.E.2d 98, 103 (1982).

 It is clearly Indiana law that in order to hold Wallace personally liable under either of the foregoing theories with respect to the transactions concerning Kemper Policy 644 in her capacity as an alleged officer of the Debtor, the Trustee must show that Wallace had some personal involvement in the "transfer" transaction with respect to that policy. The record establishes that there is no issue as to any material fact with respect to Wallace's involvement in the change of ownership of this policy from the Debtor to Darrell, and the contemporaneous change of beneficiary to provide her with a 60% beneficiary interest in the proceeds of the policy. The record establishes conclusively that this transaction was all Darrell, and that in fact that at the time it was done, Wallace knew nothing about it and was in Florida.

The Court determines that Wallace is entitled to the entry of judgment against the Trustee with respect to the Trustee's claims under 11 U.S.C. § 544(b)(1) against her for recovery of proceeds of Kemper Policy 644 received by her under the theories of breach of fiduciary responsibility owed by a corporate officer to the corporation, and of personal liability of a corporate officer for acts engaged in by that person in the context of the business of a corporation.

### B. *Piercing the Corporate Veil to Hold Wallace Liable Personally*

 The Trustee also asserts that Wallace may be held liable for the return of the proceeds of Kemper Policy 644 paid to her pursuant to 11 U.S.C. § 544(b)(1) under the theory of "piercing the corporate veil", as a cause of action that could be asserted by an actual creditor of the debtor. There is no question that the requisite "actual creditor" exists in the form of the Investment Certificate Holders.

This theory is somewhat more involved than the "responsible corporate officer" theories discussed in the preceding section of this decision. Under a "piercing the corporate veil" theory, an individual is deemed to be the "alter ego" of a corporation with the result that the individual becomes liable for all debts and obligations of the corporation, just as if there had been no corporation at all and the individual conducted the corporation's business as a personal venture.

The basic parameters of the concept were defined as follows in *Winkler v. V.G. Reed & Sons, Inc.,* Ind., 638 N.E.2d 1228, 1232 (1994) as follows:

> As the Court of Appeals correctly noted, Indiana courts are reluctant to disregard a corporate entity, but will do so to prevent fraud or unfairness to third parties [citations omitted]. The burden is on the party seeking to pierce the corporate veil [citation omitted], to establish 'that the corporation was so ignored, controlled or manipulated that it was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice.' *Gurnik v. Lee,* Ind. App., 587 N.E.2d 706, 710.
>
> When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry. [citation omitted]. As a general state-

ment, the factors to be considered include whether the corporate form has been adhered to, whether corporate assets are treated as such or are as personal assets, and whether there has been an attempt to deceive third parties [citations omitted].

As further elaborated in *Hart v. Steel Products, Inc.*, Ind.App., 666 N.E.2d 1270, 1277 (1996):

When a court exercises its equitable power to pierce the corporate veil, it engages in a highly fact-sensitive inquiry [citation omitted]. The burden is on the party seeking to pierce the corporate veil to prove that the corporate form was so ignored, controlled or manipulated that it was merely an instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice. [citation omitted]. In determining whether a party has met his burden, a court considers whether evidence has been presented showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representations by corporate shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5)payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling or manipulating the corporate form. [citation omitted].

And in *State v. McKinney*, Ind.App., 508 N.E.2d 1319, 1320–21 (1987) it was writ:

Indiana courts are reluctant to disregard the corporate entity and do so only to protect innocent third parties from fraud or injustice when transacting business with a corporate entity [citations omitted]. The rationale for this rule was summarized in [*Clarke Auto Co.,*

*Inc. v. Fyffe*, Ind.App., 124 Ind.App. 222, 116 N.E.2d 532, 535 (1954):

'The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. *The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts.* Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all of its stock and assets will be treated as identical, the corporate entity being disregarded where used *as a cloak or cover for fraud or illegality.'*

116 N.E.2d at 535 (original emphasis) (quoting 13 Am.Jur. § 7, p. 160 (now found at 18 Am.Jur.2d *Corporations* § 43 (1985))).

In [*Extra Energy Coal Co. v. Diamond Energy*, Ind.App., 467 N.E.2d 439 (1984) ] we concluded that '(t)here being no evidence of fraud or misrepresentation, the fact that Extra Energy's decision to do business with Diamond Energy was ultimately a poor one does not raise these circumstances to the level of unfairness, fraud, or injustice necessary to hold General Petroleum and these individuals liable for the debts of Diamond Energy.' We also noted that actual fraud might not be required to pierce the corporate veil: '[a]pplication of the concept of constructive fraud, as requested by the plaintiff-appellant, is unwarranted in light of the absence of misrepresentation or deception.' *Extra Energy*, 467 N.E.2d at 442 n. 1.

With the foregoing principles in mind, let's examine the Trustee's claim. The

Trustee seeks to recover, for the benefit of creditors of the debtor corporation, proceeds of a life insurance policy which was originally payable to the corporation solely, but that due to individual acts of Darrell Shults was altered to direct payment of 60% of those proceeds to Wallace. Is this a circumstance in which piercing the corporate veil is a viable theory? The Court determines that it is not. The premise for the Trustee's action is 11 U.S.C. § 544(b)(1), a section which concerns the avoidance of a "transfer". The theory of "piercing the corporate veil" does not concern the avoidance of transfers; rather, this concept is one which, if successfully asserted, causes a person or persons to become liable for corporate debts and liabilities. The transaction at issue here did not create or otherwise involve a debt or obligation owed to any creditor by First Financial. In short, the "piercing the corporate veil" concept is simply not a remedy available for the transaction involving Kemper Policy 644: that theory has no applicability to the avoidance of a transfer of corporate property. *See, In re Myers,* 320 B.R. 667, 669, fn. 4 (Bankr. N.D.Ind.2005)(Grant, J).

The Court determines that Wallace is entitled to the entry of judgment against the Trustee with respect to the Trustee's claims under 11 U.S.C. § 544(b)(1) on the theory of "piercing the corporate veil" under Indiana law concerning this asserted theory with respect to Kemper Policy 644.

## II. *Premiums paid:*

The Trustee next argues that he is entitled to recover from Wallace—on the same theories advanced with respect to Kemper Policy 644—the amounts of all life insurance premiums paid by the Debtor on various life insurance policies. To achieve this end, once again the Trustee relies on § 548(a)(1)(A), 11 U.S.C. § 548(a)(1)(B)

and 11 U.S.C. § 544(b)(1)—including other state law causes of action which, among others, include a breach of fiduciary duty and piercing the corporate veil. Each policy premium payment transaction will be addressed in turn.

### A. *Zurich Kemper policy FK2379646—premiums totaling $795.00*

■ The allegations which give root to this claim are simple. In essence, the Trustee asserts that the Debtor's payment of premiums on a policy insuring Darrell's life, which was owned by Darrell and of which Wallace was the primary beneficiary, constitutes fraud. It was fraud on the Debtor's creditors, according to the Trustee, for the insolvent Debtor to continue making premium payments on a policy which provided no benefit to the Debtor. The $250,000.00 face value policy in question was purchased by Darrell in early 1997. The Debtor made a total of three $265.00 premium payments on this policy, each one in March of 1997, 1998, and 1999. Following Darrell's death, Wallace received the sum of $252,123.17 on June 8, 1999.

The Trustee's assertions have implications far beyond the issues in this case. The Trustee is in essence arguing that a closely held corporation which is undercapitalized and essentially insolvent "hinders, delays or defrauds" its creditors when it pays premiums for a life insurance policy which insures the life of its principal for the benefit of beneficiaries other than the corporation or its creditors. If the Court sides with the Trustee on his assertions under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B), the Court will have in essence decreed that a benefit provided to employees by a significant number of corporations—corporate payment of premiums for life insurance on the lives of

employees—is a fraudulent transaction in a circumstance in which the corporation is ultimately determined to have been under-capitalized and/or "insolvent" and/or is ultimately unable to pay its debts. The Court does not deem this to be a wise policy decision because of its broad implications with respect to employee benefits rather routinely provided by corporations and other forms of business enterprises to employees. While it is true that in this case the benefit provided by First Financial's payment of premiums inured solely to the sole shareholder, President and founder of the corporation, that is the case with any number of closely held corporations. The crux of the Trustee's argument is that a corporation which is not adequately capitalized, or is not profitably operated, so that it can pay its creditors commits fraud on its creditors when it pays a life insurance policy premium on any policy insuring the life of an employee of which the corporation is not the beneficiary. The Court will not adopt a position which has the broad-reaching ramifications of that which the Trustee espouses. The transactions at issue here—in which the corporation paid premiums of $265 per year over a period of three years on a policy which was never payable to the corporation for the benefit of its creditors—are absolutely distinguishable from the circumstances involving the change of beneficiary with respect to Kemper Policy 644. The Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions concerning recovery of $795 of premiums paid by First Financial with respect to Kemper Policy 646 under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B). Obviously, under the same analysis, the Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions concerning recovery of $795 of premiums paid by First Financial with respect to Kemper

Policy 646 under the theory of recovery advanced by the Trustee under 11 U.S.C. § 544(b)(1) by utilization of §§ 14 and 15 of the Indiana Uniform Fraudulent Transfers Act.

■ The Trustee's assertion that the $795 of premiums paid by First Financial with respect to Kemper Policy 646 are recoverable from Wallace under 11 U.S.C. § 544(b)(1) under theories of breach of corporate duty owed by Wallace as an officer of First Financial, and on the theory of acts engaged in by an officer in the context of the business of a corporation—fare no better. First, the record establishes that there is no issue as to any material fact that Wallace was not involved in the transactions involving the payment of premiums on Kemper Policy 646. More importantly, even if she had been, the same policy considerations that were cited by the Court in relation to the Trustee's assertions under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B) apply to these theories. The Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions concerning recovery of $795 of premiums paid by First Financial with respect to Kemper Policy 646 under 11 U.S.C. § 544(b)(1) with respect to theories of Wallace's liability as a corporate officer with respect to those premium payments.

As discussed with respect to Kemper Policy 644, the assertion of the theory of "piercing the corporate veil" won't fly to avoid a transfer of corporate property, and thus the Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions concerning recovery of $795 of premiums paid by First Financial with respect to Kemper Policy 646 under 11 U.S.C. § 544(b)(1) under the theory of "piercing the corporate veil".

The bottom line with respect to Kemper Policy 646: Wallace is entitled to judgment on all theories of recovery advanced by the Trustee.

### B. *Valley Forge policy TRCI000071— premiums totaling $8,068.97*

Next, the Trustee asserts the same theories as above and argues for recovery from Wallace of premiums the Debtor paid on Valley Forge life insurance policy TRC1000071 ["TRC071"]. This Valley Forge policy was applied for by Wallace as the insured, and Darrell was its designated beneficiary. The Debtor made 4 premium payments between June 9, 1997 and February 9, 1999, totaling $8,0687.97 with respect to this policy.

Starting from the back and going forward, for the reasons stated above, the theory of "piercing the corporate veil" has no applicability to this policy, and thus Wallace is entitled to judgment with respect to the Trustee's assertions against her under this theory.

Next we confront the Trustee's theories under 11 U.S.C. § 544(b)(1), that by application of Indiana law, Wallace is liable for return of the premiums to the Debtor because of her involvement in the premium payment transactions as a corporate officer.

Indiana case law does provide for liability of a corporate officer under certain circumstances for actions of the corporation in which, or with respect to which, an officer was directly involved, or perhaps even failed to act in opposition when a particular transaction was known to him/her—but only if he/she had sufficient "control" within the corporate structure to direct, or influence, the corporation's conduct. The two separate theories advanced by the Trustee are really only one in the context of this case, in which any recovery by the Trustee inures to the benefit of the Debtor's creditors, rather than to the Debtor corporation itself: A corporate officer may be held personally liable to creditors of the corporation, or to the corporation itself, if that officer participates in, or fails to assert control over, a corporate transaction which constitutes a fraud on creditors or constitutes tortious conduct by the corporation. Viewed in this manner, the issue with respect to the Valley Forge TRC071 Policy is whether the payment of premiums on this policy was first a "fraudulent" or "tortious" act, and then second whether Wallace was involved in the transactions involving payment of the policy premiums.

The Court finds that Wallace applied for this policy; that Wallace was the owner and the insured of this policy; that Darrell was the beneficiary of this policy; and that all premiums for the policy were paid by the Debtor. As stated above with respect to Kemper Policy 646, the Court deems there to be "nothing wrong" with a closely held corporation's providing payment for a term life insurance policy on the life of one of its employee principals, no matter who the beneficiary is. But there's the rub here. Wallace contends, and adamantly so, that she was a pawn for Darrell in the operation of the corporation, and that she had no active role in the operation of, or business affairs of, First Financial. Yet, the record establishes that she was held out to be the Secretary/Treasurer of the corporation: she was represented to investors to be an integral cog in the corporate wheel; and that she signed a number of corporate documents, including checks, as a corporate officer. The record also establishes beyond any question that Wallace *herself* applied for the TRC policy, and thus any assertion on her part of noninvolvement in the transaction concerning issuance of this policy is to be disregarded.

However there is another step. If Wallace was an active officer and employee of the corporation, is the provision by the Debtor of payment for a life insurance policy on her life, no matter who the beneficiary is, a transfer recoverable from Wallace under the Trustee's "officer liability" theories? The Court has answered this question previously—NO: In the context of a closely held corporation, the payment of premiums by a corporation for a term life insurance policy insuring the life of an officer/principal of the corporation is just fine, at least as far as the amount of the premiums in this case go. Thus, were Wallace ultimately determined to not be an officer with sufficient control over the corporation to influence this transaction, then the Trustee will lose on this theory, because Wallace will have been determined to have had no ability to control the actions of the Debtor with respect to payment of premiums. If Wallace is determined to be an officer involved in the business of the corporation, then in the Court's view the provision of this policy to her is neither fraudulent nor tortious. Whichever way the determination goes with respect to Wallace as to her involvement in the corporation, the Trustee loses, as a matter of law. Wallace is thus entitled to judgment with respect to the Trustee's theories of officer liability concerning TRC071.

■ This brings us at last to the Trustee's assertions that the premiums paid for the policy are recoverable from Wallace under fraudulent conveyance theories.

The focus of the Trustee's action under 11 U.S.C. § 548(a)(1)(A) is that First Financial's payment of the premiums on this policy was undertaken with the "actual intent" to "hinder, delay or defraud ..." a creditor. If Wallace is determined to have been an actual "key person" in the affairs of the Debtor, Wallace will get a pass on this theory, on the same rationale as stated with respect to Kemper Policy 646. But if Wallace was not active in the corporation, and the payment of the premiums on a policy insuring the life of a "stranger" was made by Darrell alone acting on behalf of First Financial, a different kettle of fish begins to boil, and the odor of the fish boiling doesn't waft completely fresh. But is the odor enough to justify a judgment for the Trustee as to actual intent to "hinder, delay or defraud" creditors?

The author of this decision is a huge fan of CSI Miami. As any afficionado of that television series is aware, the fingerprints of a potential suspect may at times be found everywhere at a crime scene, without that suspect being ultimately responsible for the perpetrated crime.

The record is replete with Wallace's fingerprints with respect to the activities of First Financial Associates, Inc. She is designated as the "Secretary" of the corporation on documents filed with the Indiana Secretary of State. She is designated as an officer and manager of the corporation in documents utilized by the debtor corporation to solicit investments from prospective investors. She personally signed documents as the Secretary of the corporation in transactions involving the corporation. She also signed negotiable instruments (checks) utilized by the corporation to pay its obligations. The Trustee's contentions as to Wallace's involvement in the actual operation of the Debtor are premised upon these circumstantial indications. However, in order to convict the suspect, it is necessary to establish an active participation in the crime apart from the existence of fingerprints at the crime scene. The evidence in this case is entirely lacking as to any actual day-to-day personal involvement by Wallace in the activities—whatever they were—conducted by First Financial Associates, Inc. The evidence

submitted by the Trustee essentially boils down to the fact that Wallace's name appears on documents as the Secretary of the corporation; that she signed certain documents as Secretary of the corporation; and that she *signed* negotiable instruments as an authorized signatory on the corporation's bank account. Dorothy L. Wallace testified that she had no active involvement in the management of the corporation, and that she signed documents as an accommodation to her life partner Darrell Shults. With respect to her signature on negotiable instruments, she testified that Darrell Shults essentially directed to whom payments would be made and the manner in which they would be made, with the possible exception of office supplies which apparently Ms. Wallace was authorized to purchase on her own by the utilization of corporate checks. The evidence before the Court establishes what the evidence in nearly every circumstance in which a husband utilizes his wife in the operation of his closely-held business establishes: she signs documents, she is designated as having some formal involvement in the corporation on official documents, she can sign some checks when directed to do so by her husband, and she can make relatively small purchases on her own without his prior approval. That is the extent of what this record establishes as to the actual ability of Dorothy L. Wallace to make substantive determinations as to the actions of the Debtor. Let there be no mistake: the Court determines that Dorothy L. Wallace was *in fact* the Secretary, as a designated corporate officer, of First Financial Associates, Inc. However, the Court also determines that the record is insufficient to establish any substantive involvement by Dorothy Wallace in the activities of the debtor corporation, or with respect to control of the manner in which the debtor corporation did business. Thus, Dorothy L. Wallace was not a "key

person" with respect to the Debtor, and the Court's pronouncements that it will not tamper with employee benefit payments made on behalf of a "key person" do not apply to her.

Has the Trustee established that payment of premiums by the Debtor on the Valley Forge Policy were made with the "actual intent" to "hinder, delay or defraud ..." a creditor? The Court finds that the Trustee has not established this actual intent. While it might be hypothesized that Darrell Shults might have realized at the time these premium payments were made that investors would ultimately seek to tan his hide, there is no evidence in the record that any investor had approached him with a branding iron or a kettle of hot tar at the time these premium payments were made. Thus, the Trustee's action under 11 U.S.C. § 548(a)(1)(A) fails due to lack of evidence as to any actual intent.

However, having determined that Dorothy L. Wallace was not a key person or employee in the Debtor's business, the Trustee fares better under 11 U.S.C. § 548(a)(1)(B). In the context of this provision, the "transfer" is the payment of premiums for a life insurance policy owned by Wallace. It is indisputable that the Debtor received no consideration for the payment of premiums [§ 548(a)(1)(B)(i) ] and that the Debtor was "insolvent" when the premium payments were made [§ 548(a)(1)(B)(ii)(I) ]. Pursuant to 11 U.S.C. § 550(a)(1), these transfers were made for the benefit of Wallace as the owner of the policy. Thus, the Court determines that the Trustee is entitled to recover from Wallace under 11 U.S.C. § 548(a)(1)(B) with respect to premium payments made by the Debtor concerning Valley Forge Policy TRC071, pursuant to 11 U.S.C. § 550(a)(1). Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee's recovery is limited to transfers made within the

year prior to filing of the Debtor's petition; the record establishes that the premiums paid on this policy during that period were $2,068.36 paid on September 23, 1998 and $3,932.25 paid on February 9, 1999, for a total recovery of $6,000.61.

The foregoing reasoning applies equally to the Trustee's actions under 11 U.S.C. § 544(b)(1), seeking to recover premium payments from Wallace under § 14 and § 15 of the Indiana Uniform Fraudulent Transfers Act. The Court determines that the Trustee is not entitled to recover premiums pursuant to I.C. 32–18–2–14. The record does not sustain a finding of "actual intent" under I.C. 32–18–2–14(1), nor does it sustain either of the elements of I.C. 32–18–2–14(2): Proof of insolvency does not establish the latter elements, and the record is insufficient to establish the Debtor's business operations sufficiently to prove those elements. Admittedly, without detailed corporate records, the Trustee was at a disadvantage to prove what the Debtor actually did in its business. However, the lack of adequate records does not create evidence sufficient to sustain the Trustee's burden of proof on these elements.

The Trustee *is* entitled to recover premiums under I.C. 32–18–2–15(1) and (2)(A). The payment of premiums—a transfer—was made without the Debtor's receiving a "reasonably equivalent value" with respect to the transfer, given that Wallace, as the essential recipient of the product with respect to which the transfer was made, performed no essential function for the Debtor. The Debtor was insolvent when the premium payments were made. I.C. 32–18–2–18(b)(1)—like 11 U.S.C. § 550(a)(1)—allows the transfer to be recovered from the person for whose benefit the transfer was made, i.e., Dorothy Wallace as the owner of, and insured under, the policy. The amount of the recovery in this context is not limited as it is under federal law, and thus the Trustee is entitled to recover the amount of $8,068.97 from Dorothy L. Wallace pursuant to 11 U.S.C. § 544(b)(1)/I.C. 32–18–2–15(1) and (2)(A), and I.C. 32–18–2–18(b)(1).

### C. *Valley Forge policy TRCI000028—premiums totaling $8,068.97*

The Trustee seeks to recover premiums paid by the Debtor on a life insurance policy ["TRC028"] with respect to which Wallace's life was insured for the benefit of the Debtor First Financial as the beneficiary. The same theories of recovery of premiums as in the foregoing actions with respect to Kemper Policies 644 and 646 are advanced against Wallace by the Trustee.

As addressed above, the prospectus provided by the Debtor to its investors stated that "key person" coverage was provided by First Financial with respect to Wallace. How paying premiums for a life insurance policy in conformity with this representation is an action to "hinder, delay, or defraud creditors" escapes the Court, as does the assertion that Wallace—whether or not she had active involvement in the decision to pay these premiums—breached some form of duty she owed First Financial and its creditors by causing the Debtor to pay these premiums. Creditors would only have benefitted by Wallace's death under the provisions of this policy. There is no sustainable theory of recovery against Wallace with respect to this claim. Unlike the circumstances of Valley Forge Policy TRC1000071, the fact that the debtor corporation—and thus its creditors—was the beneficiary of this policy removes this transaction from any consideration of disadvantage to creditors.

The Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions concerning recovery

of premiums totaling $8,068.97 on Valley Forge policy TRCI000028.

### D. *New York Life policy A0328853—premiums totaling $1024.40*

This New York policy was also applied for by Wallace, listed Wallace as the insured, and Darrell as the beneficiary. The Debtor, according to the Trustee, made three premium payments: January 29, 1997—$350.00, March 2, 1998—$334.20, and February 9, 1999—$340.20, for the total of $1,024.40.

The analysis made with respect to Valley Forge Policy TRC1000071 is totally applicable here. Starting from the back and going forward, for the reasons stated above, the theory of "piercing the corporate veil" has no applicability to this policy, and thus Wallace is entitled to judgment with respect to the Trustee's assertions against her under this theory.

Next we confront the Trustee's theories under 11 U.S.C. § 544(b)(1), with respect to corporate officer liability. There is no issue as to any material fact that Wallace applied for this policy; that Wallace was the owner and the insured of this policy; that Darrell was the beneficiary of this policy; and that all premiums for the policy were paid by the Debtor. There is an issue of fact as to Wallace's involvement, as an officer of First Financial, in the transactions involving this policy. But as stated above, however that factual issue sorts out, the Trustee loses on this theory of recovery. Thus, Wallace is entitled to judgment as a matter of law on the Trustee's two theories of corporate officer liability with respect to the premium payments made by the Debtor on this policy.

Determination of issues advanced by the Trustee with respect to the New York Life policy are identical to those advanced by the Trustee with respect to Valley Forge policy TRC1000071, and the Court hereby adopts the findings of fact and conclusions of law stated previously with respect to that policy as its findings of fact and conclusions of law with respect to issues raised by the Trustee with respect to this policy.

The Court determines that Dorothy L. Wallace is entitled to judgment against the Trustee with respect to the Trustee's claims advanced under 11 U.S.C. § 548(a)(1)(A)/11 U.S.C. § 550(a)(1) and with respect to the Trustee's contentions advanced against Wallace pursuant to 11 U.S.C. § 544(b)(1)/I.C. 32-18-2-14. The Trustee is entitled to judgment against Dorothy L. Wallace pursuant to 11 U.S.C. § 548(a)(1)(B)(i)/(ii)(I)/11 U.S.C. § 550(a)(1) in the amount of $340.20, and to judgment against Dorothy L. Wallace pursuant to 11 U.S.C. § 544(b)(1)/I.C. 32-18-2-15(1) and (2)(A), and I.C. 32-18-2-18(b)(1), in the amount of $1,024.40.

### E. *Principal Mutual Life policy N3505-4716 . . .—premiums totaling $1,200.00*

The last of the insurance policies subject to this action is the Principal Mutual Life policy. Here, the Debtor was the owner and Plan holder of this group health and life insurance policy, Darrell was its plan member/insured and Wallace was the beneficiary. On April 12, 1999, a premium payment of $1,200.00 was made—either from the Debtor's funds or from funds obtained from Wallace—and on August 1st, because of Darrell's suicide, Wallace received $100.000.00 in death benefits.

Based upon the record before it, the Court determines that the issues of recovery of premiums under this policy are identical to the issues with respect to Kemper policy 646. Even assuming *in arguendo* that the premiums were paid with the Debtor's funds, this policy was a

group employee plan term policy, and the Court simply will not invalidate premiums paid on a policy of this nature, at least to the extent of the premiums paid in this case.

The Court determines that Wallace is entitled to judgment in her favor on all theories of recovery advanced by the Trustee with respect to the Principal Mutual Life policy.

### III $305,000.00—Investment Certificates

The Trustee also seeks to recover from Wallace the total amount of unpaid investment Note Certificates, in the amount of $158,600.00.[11]

The first prong of the Trustee's theory is that Debtor, by the manner in which it solicited investments and dealt with those investments, violated securities laws of the State of Indiana. As an alternative to his argument that the manner of the operation of the Debtor's business violated Indiana securities laws, the Trustee asserts that this manner of operation constituted a "ponzi" scheme.[12]

Putting aside whether or not the Trustee's characterizations of the Debtor's business are accurate, Dorothy L. Wallace's liability depends upon her substantive involvement in some part in the Debtor's business. The Trustee hangs his hat on I.C. 23–2–1–19(d), which he asserts provides "absolute" liability with respect to Wallace, and which in pertinent part provides:

> A person who *directly or indirectly controls* a person liable under subsection (a), (b), or (c), a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating the liability, and a broker-dealer or agent who materially aids in the conduct are also liable jointly and severally . . . [13]
> (emphasis supplied)

In support of his theory of "strict liability", the Trustee has cited *Kirchoff v. Selby*, Ind., 703 N.E.2d 644 (1987) and *Arnold v. Dirrim*, Ind.App., 398 N.E.2d 426 (1979). The latter case has very little substantive analysis and will not be ad-

---

**11.** The Trustee's computation is as stated on page 23 of his "Findings of Fact and Conclusions of Law". The base of the computation is premised upon the Trustee's computation of the amount of damages awardable for violation of securities law violations in the amount of $305,000.00; the accrual of interest on those obligations; and the apportionment of the total accrued unpaid investments plus interest to Dorothy L. Wallace in proportion to her asserted joint liability.

**12.** As the Trustee correctly notes, the assertion that the Debtor's business was a "ponzi" scheme adds nothing substantively to the Trustee's claims, apart from the fact that it gives a sexy name to the Trustee's characterizations of the Debtor's business.

**13.** In support of his asserted recovery, the Trustee has in part relied upon 11 U.S.C. § 544(b)(1) as his premise for recovery. That section, in the context of this case, applies

only to the recovery of transfers; of property by the debtor; See, In re Myers, 320 B.R. 667, 669, fn. 4 (Bankr.N.D.Ind.2005). The Court determines that Wallace is entitled to judgment on this theory, in that the Trustee is not seeking recovery of a transfer but rather is seeking to hold Wallace liable for the debts owed by the Debtor to its creditors.

The Trustee has also asserted a theory of "piercing the corporate veil" with respect to this claim of recovery. This claim is assertable in the context of this case, if at all, only under 11 U.S.C. § 544(a). The Trustee has not based his claims on this section, and thus the Court determines that Wallace is entitled to judgment with respect to the Trustee's assertions of liability against her for recovery of the amount of indebtedness owed by the Debtor to its investors under a theory of piercing the corporate veil.

dressed by the Court. As stated by the Indiana Supreme Court in *Kirchoff*:

> [O]nly the fourth and fifth categories require personal participation in the transaction. The statute does not require a partner, officer, director or controlling person to materially aid a violation to be liable.
>
>> [I]t seems apparent that this statutory provision imposes absolute liability upon the director of a corporation [with respect to] the purchasers of securities sold in violation of the Securities Act based on his position as a director unless he proves a statutory defense. (citing *Arnold* ).

703 N.E.2d at 651.

One cannot fault the Trustee for his attempts to benefit the primary creditors of this bankruptcy case. One can certainly not fault the Trustee for his asserted construction of I.C. 23–2–1–19(d). However, the Court does not agree with the Trustee's construction of that statute.

 First, the facts in *Kirchoff* establish that the Kirchoffs were extensively involved in the management of the entity which issued the alleged securities involved in that case. For its overly-glossed statement (essentially *dicta* ) that I.C. 23–2–1–19(d) provides for "absolute" liability for a director of a corporation, the Indiana Supreme Court cited the cases of *Moerman v. Zipco, Inc.,* 302 F.Supp. 439 (E.D.N.Y.1969), *aff'd* 422 F.2d 871 (2nd Cir.1970) and *Rzepka v. Farm Estates, Inc.,* 83 Mich.App. 702, 269 N.W.2d 270

(1978), including two other cases of lesser import. Review of the two cited cases will disclose that the focus of each court's determination that the particular state's securities law under review imposed "absolute liability" was a circumstance in which the target defendants were extensively involved in the management of the issuing entity, although not necessarily involved in the issuance of the security in question. Thus, it is a misinterpretation of Indiana law to assert that the mere designation of an individual as an officer of a corporation causes that individual to be absolutely liable for any securities laws violations engaged in by the entity for which the individual has been designated an officer or director. Followed to its logical end, the Trustee's contention results in the imposition of liability upon an individual who, while designated in documents and records as an officer or director, never attended a corporate meeting and never did a single act with respect to corporate affairs or business—the kind of person fellow officers or directors disparage behind his/her back ("If he/she wants the title, he/she should do the work".) The real focus of the "absolute liability" provision is that an individual whose *actual involvement in the corporation's* business puts him/her in position to control, or to attempt to control, the actions of the securities issuer as an officer or director of a corporation, cannot turn a blind eye to securities fraud by eschewing that ability to control in relation to the security's issuance.[14]

---

**14.** It is interesting to note that the Trustee advances a similar argument with respect to the liability of Dorothy L. Wallace for certain corporate transactions based solely upon her "status" as a designated corporate officer, relying in part on *Burroughs v. Fields,* 546 F.2d 215 (7 th Cir.1976) and *In re Thomas,* 729 F.2d 502 (7th Cir.1984). These two cases involved asserted liabilities of corporate officers for acts of a corporation under Wiscon-

sin law. The Seventh Circuit determined that under Wisconsin law, the actual involvement of a person designated as an officer or director in the operation of a corporation was irrelevant to that person's derivative liability for illegal actions of a corporation. In this Court's view, this is not the law of the State of Indiana. In Indiana, a corporate officer, director or shareholder may not be held liable for acts by the corporation merely because he

The Court determines that I.C. 23–2–1–19(d) does not establish absolute liability on the part of an officer or director of an Indiana corporation for an alleged securities law violation of that corporation, based solely upon the individual's status as a designated officer or director. While it is not necessary to establish that the officer or director directly participated in the securities fraud, *it is necessary* to establish that the officer or director was at least potentially in a position of management or control of the corporation's affairs such that he or she could assert some influence over the issuance of the security in question.

■■■ We now come to the record in this case in light of the foregoing principles. As determined previously by the Court, Wallace's fingerprints are all over the crime scene of whatever activities may have been engaged in by the Debtor. What is strikingly lacking, however, is *any* evidence of Wallace's actual involvement in the decision-making structure of the corporation. Trusted office employees, or wives as non-employees, are often designated as the Secretary of a closely-held corporation, solely for the purpose of having someone designated as holding that office apart from the person who actually controls the entity. This of course leads to the attestation of corporation documents by that person in his/her capacity as Secretary. The fact that some checks were signed by Dorothy L. Wallace as an authorized signatory on the corporation's account does not in and of itself in any manner establish that Dorothy L. Wallace could in fact make her own independent determination of who would receive payment by means of those checks, and all of the evidence in this case—apart from inferences which the Trustee *wishes* the Court would draw—are that her signing of checks was at the direction and control of Darrell Shults, with the exception of certain minor purchases, which a number of business entities make out of petty cash and trust to the management of certain individuals other than a person actually involved in operation of the business.

■■■ The Court concludes that Indiana law requires, both in the context of corporate officer/ director liability and in the context of liability for "securities fraud" under I.C. 23–2–1–19(d), that a basic foundational element of involvement in the corporation as a substantive decision-maker or as one who has input on substantive decision-making which must be acknowledged and has in the past been acted upon, must be established. The record in this case fails to establish that requisite control on the part of Dorothy L. Wallace. The Court thus determines that with respect to the Trustee's assertions of liability of Dorothy L. Wallace for recovery of "investor" payments failed to establish the requisite control or ability to control the affairs of the debtor corporation in a manner which subjects Dorothy L. Wallace to liability on those theories.

The Court determines that Dorothy L. Wallace is entitled to judgment on the Trustee's claims asserted against her with respect to recovery of any amount of the obligations of the corporation evidenced by unpaid Investment Note Certificates.

### IV. *GE Account—$1,023.86*

■■■ Lastly, the Trustee seeks to recover from Wallace the sum of $1,023.86, the amount of charges Wallace made to the Debtor's corporate credit card for per-

---

has the designation of an officer, director or shareholder; *Birt v. Mary Mercy Hospital of Gary, Inc.*, Ind.App., 175 Ind.App. 32, 370 N.E.2d 379 (1977); *American Independent Management Systems, Inc. v. McDaniel*, Ind. App., 443 N.E.2d 98 (1982).

sonal, nonbusiness-related expenses. The Trustee asserts the same theories of recovery as outlined above with respect to his attempted recovery of life insurance policy premiums and proceeds.

The record in this case establishes that Wallace was an authorized user of the GE credit card. [Trustee's Ex. 16]. Wallace, in her briefs, states that Darrell gave her the GE credit card and told her to use it. Wallace does not dispute that she used the credit card when she traveled to Florida for personal reasons, unrelated to any business of the Debtor.

There is no evidence in the record before the Court that the Debtor paid the charges incurred for Wallace's personal trip. While the concept of "transfer" is very broad, and the concept of "property" is also very broad—under both 11 U.S.C. §§ 544 and 548—the Court is unwilling to extend either concept to encompass a circumstance in which a person, whether or not associated with a corporation, uses corporate credit for which the corporation itself does not pay. In this circumstance, there simply isn't any "transfer" of property of the corporation for the benefit of anyone: the incursion of a debt is not a transfer of property or of an interest in property. As a result, the Court finds that Wallace is entitled to judgment with respect to the Trustee's theories of "transfer" under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B), and also under the related theories of transfer recovery under 11 U.S.C. § 544(b)(1) with reference to the §§ 14 and 15 of the Indiana Uniform Fraudulent Transfers Act.

That leaves us with the theories of recovery for breach of corporate officer duty and "piercing the corporate veil". As addressed above, the theories advanced by the Trustee revolve around 11 U.S.C. § 544(b)(1), which requires a "transfer" as a premise for the assertion of recovery. Because there is no evidence of the Debtor's payment, there was no "transfer" with respect to Wallace's use of the Debtor's credit card, and thus the Court finds that Wallace is entitled to judgment as a matter of law with respect to the Trustee's theories of corporate officer liability and "piercing the corporate veil" under 11 U.S.C. § 544(b)(1).

### V. *Action Against Elmer Shults*

The Trustee asserts that the defendant Elmer Shults is liable to the estate as a "subsequent" or "median" transferee with respect to fraudulent transfers made to the defendant Dorothy L. Wallace. The focus of the Trustee's action is a transfer of $250,000.00 made by Dorothy L. Wallace to Elmer Shults.

The Court finds that the evidence submitted to it establishes that Dorothy L. Wallace was the beneficiary of proceeds of Kemper Policy 644.[15] The gist of the Trustee's action is that Wallace received a fraudulent transfer of $151,273.90 from the Debtor (a determination with which the Court concurs) and that that amount—including enhancement by interest which accrued on the money market fund—was transferred to the defendant Elmer Shults and thus should be recoverable from him pursuant to 11 U.S.C. § 550(a) and applicable provisions of state law.

---

**15.** The Court has previously determined in this opinion that transfer of proceeds of this policy in the amount of $151,273.90 constituted a fraudulent transfer to Wallace. This was a $250,000.00 life insurance policy, the proceeds of which were initially allowed to be maintained by Kemper Life Insurance Company in a money market fund. There is no question that 40% of this policy was the Debtor's property; however, there is no action before the Court to recover the $100,000.00 amount payable to the corporation from Wallace.

As far as the Court and the Trustee have been able to determine by their research, the circumstances of this case present a circumstance with respect to which there is no reported decision.

The evidence conclusively establishes that Elmer Shults received two checks from Dorothy L. Wallace, in the total amount of $250,000.00, which he then placed in a money market fund under his name at AG Edwards. The record also conclusively establishes that approximately two months after that deposit, the account at AG Edwards was transferred by Elmer Shults to Dorothy Wallace. There is no evidence that during the time that the AG Edwards account was maintained in his name, Elmer Shults exercised any control over the monies in that account or utilized any of the monies in that account for his benefit. The evidence does establish that at the time of the transfer of the account back to Dorothy Wallace all funds which he received and deposited in the AG Edwards account were in fact returned by him to Dorothy L. Wallace, who thereafter exercised control over those funds on her own without the involvement of Elmer Shults.

The Court first notes that there is some uncertainty as to the origin of the $250,000.00 placed in the AG Edwards account by Elmer Shults. Policies on the life of Darrel Shults issued by Kemper Insurance Company generated death benefits totaling $400,000.00. $250,000.00 derived from Kemper Policy 644. The Court has determined that transfer of $150,000.00 (plus accrued interest) of the benefits under this policy was a fraudulent conveyance effected by Darrel Shults by means of his death by suicide, and that Dorothy L. Wallace is liable as a transferee of this fraudulent conveyance for return of this amount to the bankruptcy estate. $100,000.00 of this policy's death benefit is not recoverable by the estate. A death benefit of $100,000.00 was paid to Dorothy L. Wallace under Kemper Policy 646; the Court has determined that the death benefit is immune from challenge by the Trustee.

To the extent he is derivatively liable at all under 11 U.S.C. § 550(a)(2), the defendant Shults is only liable for amounts he received from Wallace which constituted a fraudulent transfer by the Debtor to Wallace. Wallace received $400,000.00, plus a small amount of accrued interest on a money market account maintained with Kemper, as death benefits on two policies on the life of Darrell Shults. $250,000.00 of these proceeds were turned over by Wallace to Elmer Shults. $150,000.00 of the proceeds of policy 644 constituted a fraudulent conveyance by the Debtor to Wallace. $150,000.00 of the proceeds of policies 644 and 646 were not turned over to Elmer Shults. The evidence before the Court does not allow specific tracing of the $150,000.00 fraudulent conveyance amount from Dorothy L. Wallace to Elmer Shults: the turnover by Wallace to Shults of two checks totaling $250,000.00 could have been comprised of $150,000.00 of proceeds of Kemper Policy 644 constituting a fraudulent conveyance plus $100,000.00 as the excess of proceeds of policy 644 or the independent proceeds of policy 646. The $250,000.00 turned over to Shults could have included the $100,000.00 excess of Kemper Policy 644 not constituting a fraudulent conveyance plus the $100,000.00 of policy 646 which did not constitute a fraudulent conveyance, thus exposing Shults to a maximum of $50,000.00 of proceeds received from the fraudulent conveyance. Admittedly, given that the policy proceeds of policy 644 and policy 646 were co-mingled in an account maintained by Kemper Insurance Company prior to their release to Dorothy L. Wallace, it is impos-

sible to definitively trace the origin of the $250,000.00 turned over by Wallace to Shults. However, it is the Trustee's burden to establish that a transfer within the provisions of 11 U.S.C. § 550(a)(2) was made. The Trustee—understandably based upon the circumstances of the Kemper account—has failed to establish that the $250,000.00 received by Elmer Shults from Dorothy Wallace was comprised of more than $50,000.00 of funds which the Court has deemed to be "fraudulently conveyed" by the Debtor to Dorothy L. Wallace, and thus the limit on the Trustee's recovery from Elmer Shults is $50,000.00.

■ We now confront the issue of whether or not Elmer Shults is liable for any transfer pursuant to 11 U.S.C. § 550(a)(2). There is no reported decision known to the Court, or discovered by the Trustee, which addresses the circumstances of this case, i.e., an acknowledged turnover of funds by a person receiving a fraudulent transfer to a subsequent transferee, with the return *in whole* of those funds to the transferee by the subsequent transferee within a very short period of time after the transfer is made. As stated previously, there is no evidence in this case that Elmer Shults derived any benefit whatsoever from Dorothy L. Wallace's turnover to him of $250,000.00: the funds were deposited in a segregated investment account; there is no evidence that the investment account was ever invaded by, or otherwise utilized by, Elmer Shults; and the investment account was returned intact—with accumulated interest—to Dorothy L. Wallace by Elmer Shults within several months after the initial transfer by Wallace to Shults.[16]

11 U.S.C. § 550(a) states in its entirety:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the

---

16. The record is inconsistent with respect to reasons for Wallace's turnover of $250,000.00 to Shults, and the timing of that turnover in relation to the filing of this adversary proceeding. Wallace testified at one point that she had been scheduled for knee replacement surgery; that she had a previously diagnosed heart condition which caused the knee replacement surgery to be somewhat problematic for her with respect to her ability to survive it or survive it in a sentient manner; and that she and others around her, including Elmer Shults, decided that it would be best if funds were transferred to Shults' name pending the outcome of her surgery. However, the dates in the record of the purported surgery in relation to the transfer do not necessarily corroborate this testimony. The Trustee sought to establish a form of "bad faith" on the part of Wallace and Shults with respect to the turnover of $250,000.00 to Mr. Shults, in juxtaposition with the date of the filing of the Trustee's action and the date of the transactions involving the turnover. The Trustee's apparent theory is that Elmer Shults may have decided to return the funds to Dorothy Wallace after the filing of the Trustee's adversary complaint against him, rather than because of her successful survival of the knee replacement surgery. The Court deems whatever the motive of Elmer Shults to have been in returning the funds to Dorothy Wallace to be irrelevant. If the original intent of the turnover by Wallace to Shults of insurance proceeds, or the original intent of Shults' transfer back to Wallace of that fund, was to evade or avoid the Trustee, then what part in that scheme would the transfer by Shults back to Wallace have played? The focus of fraudulent conveyance actions is to return the parties to the position they were in prior to the conveyance, which is all that the transfer by Shults back to Wallace did. The Court determines that whatever the motive of Shults in transferring property back to Wallace may have been, it is not evidence of "bad faith" or evidence which defeats Shults' potential assertion of a defense under 11 U.S.C. § 550(b)(2).

Administration of bankruptcy laws and other laws of the United States must be effected in a pragmatic manner. The issue before the Court is the pragmatism of 11 U.S.C. § 550(a)(2) under the circumstances of this case.

trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(b) states the following:

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.[17]

The critical element in the Court's determination is the concept of "property transferred" stated in § 550(a)'s initial provisions. The evidence is clear in this case that Wallace provided Shults with a minimum of $50,000.00 of proceeds of a fraudulent conveyance—perhaps $150,-000.00—and that Shults exercised control over those funds to the extent of depositing them in an account in his own name. The evidence also establishes that within a little more than two months after that deposit, *everything* Shults received from Wallace was returned to Wallace and that thereafter Wallace exercised exclusive control over whatever Shults had originally received from her.

The Court acknowledges that the circumstances surrounding the turnover of funds to Shults and the return of funds to Wallace may seem somewhat manipulative.

But, as stated, the bottom line is that within a little more than two months after he received funds from Wallace, Shults returned those funds in their entirety to Wallace. In their testimony, both Wallace and Shults offered a plausible—although not time-coordinated or fully intelligible— explanation as to why this transaction occurred, an explanation which the Court deems to entitle Shults to assert the defense under 11 U.S.C. § 550(b)(2), especially in light of the deference which must be given to *pro se* litigants with respect to presentation of their cases; *See also,* Fed. R.Bankr.P. 7054(a)/ Fed.R.Civ.P. 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings"); Fed.R.Bankr.P. 7015/ Fed.R.Civ.P. 15(b).

There are no cases on point. The Trustee's reasonable construction of 11 U.S.C. § 550(a)(2)—with which the Court does not agree—fits the circumstances of this case, and the Court wishes to emphasize— and is firm in emphasizing—that there has been no improper conduct by the Chapter 7 Trustee in asserting his contentions concerning that provision. The Trustee can certainly appeal this decision, and upon appeal the Court can certainly be reversed by an appellate tribunal which views a case of first impression differently that does the author of this opinion. The Trustee has advanced an argument within the literal framework of the law. Because there is no controlling precedent, the Court has the ability to determine the law itself, and in this instance the Court has simply not agreed with the Trustee's advancement of

---

17. 11 U.S.C. § 550(d) provides that the "trustee is entitled to only a single satisfaction under subsection (a) of this section", meaning that *if Shults is determined to be liable to the Trustee as immediate transferee, any combi*nation of recovery by the Trustee from Shults and Wallace of the amount of the transfer to Shults satisfies Shults' liability and Wallace's liability as well.

an entirely valid and reasonable legal position.

If one were to construe § 550(a)(2) to authorize recovery by the Trustee against the defendant Elmer Shults in this case, one would in part impinge upon other sections of the Bankruptcy Code which utilize the concept of "transfer" in determining substantive rights. For example, 11 U.S.C. § 547(b) authorizes a Chapter 7 Trustee to recover "preferential transfers" which fall within the provision of that Rule. Human experience—and as human experience is what it is [18]—it is not beyond the realm of possibility to consider a circumstance in which a debtor pays a debt to a creditor; the creditor then forgives the debt and returns the payment to the debtor; and the Chapter 7 Trustee then pursues the creditor for transfer. There is no question that a transfer within the provisions of § 547(b) was made, but the affirmation of a recovery action under those circumstances totally flies against the policy of preference recovery stated by § 547(b). The purpose of avoidance of a preferential transfer is to return property to the debtor's estate in order to equalize distribution among creditors. If the property has already been returned—even if a technical "transfer" within § 547(b) has been made—can one begin to conceptualize a correct decision by a Bankruptcy Court that would allow recovery against the transferee? Of course not. The purpose of the subsequent/mediate transferee rule of § 550(a)(2) is to provide an alternative source of recovery to a bankruptcy estate with respect to an entity (individual or other) which actually realized the benefit of the fraudulent conveyance made by the debtor, and not to merely provide another alternative source of collection apart from policy considerations for the enactment of the section.

The Court determines as a factual matter than Elmer Shults has established the defense provided by 11 U.S.C. § 550(b)(2), and that on that basis the Trustee's action against him cannot be sustained.

The Court further determines that as a matter of law, under the circumstances of this case as established by the evidence of record, Elmer Shults is not a "transferee" within the provisions of 11 U.S.C. § 550(a)(2) because no "transfer" within the meaning of that section was ultimately made to him by Dorothy L. Wallace.

The Trustee also asserts a claim on the concept of "subsequent" transferee liability against Elmer Shults pursuant to, apparently, 11 U.S.C. § 544(b)(1)/I.C. 32–18–2-17, *et seq.* 11 U.S.C. § 544(b)(1) states:

> **(b)(1)** Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

The Court determines that the investors with the Debtor constitute creditors within the provisions of § 544(b)(1), and that the Trustee may hypothetically assert their interests pursuant to state law. However, again, there is no controlling precedent in Indiana with respect to the circumstances of this case, and the Court—in the absence of any authority cited by the Trustee—will not determine that applicable Indiana law

---

18. When asked to comment upon the source of apparently extraordinary factual situations in his fiction, the Russian author Fyodor Dostoevsky stated that everything that appeared in his fiction had been derived from newspaper clippings which he had accumulated over the years. Not only is truth "stranger than fiction", but fiction cannot begin to mirror human experience in real life circumstances.

under the Uniform Fraudulent Transfer Act would construe Indiana law in a manner other than that in which the Court has construed federal law under § 550(a)(2).[19]

The Court determines, under the facts of this case, that Elmer Shults is not a "transferee" within the provisions of 11 U.S.C. § 550(a)(2). The Court further determines on the factual record before it that even if Elmer Shults was a transferee under 11 U.S.C. § 550(a)(2), he has established the defense provided by 11 U.S.C. § 550(b)(2) to the Trustee's action.

The Court determines that Elmer Shults is entitled to judgment with respect to the Trustee's complaint against him.

### VI. Punitive Damages

■ With respect to the Trustee's claim for punitive damages, because the Trustee is pursuing the claim for punitive damages under common law principles, rather than under I.C. 34–24–3–1, the provisions of I.C. 34–51–3–1 et seq. apply to this action. I.C. 34–51–3–1 states that the "chapter applies to all cases in which a party requests the recovery of punitive damages in a civil action" (emphasis supplied). To the extent that I.C. 34–51–3–1 et seq. applies, any recovery of punitive damages must be proven by clear and convincing evidence [I.C. 34–51–3–2], and—more significantly—any punitive damages awarded must be paid to the Clerk of the Court in which the judgment was entered, to be disbursed by that officer in part to the plaintiff (25% of the award) and in part to the Violent Crime Victims Compensation Fund established by the State of Indiana (75% of the amount of the award). This Court will not adopt and apply a state law provision which causes a federal court to be a collection agent/remitter for a state—and thus answerable to a State authority for its actions—and thus the Court determines as a matter of law that the Trustee is not entitled to punitive damages.

### VII Pre–Judgement Interest

■ The Trustee has requested that with respect to any recovery awarded to him, the Court award pre-judgment interest. On page 56 of its Memorandum of Decision on Cross–Motions for Summary Judgment entered on October 13, 2005, the Court determined the entitlement of the Trustee to, and the amount of, pre-judgment interest. The Court rescinds its determination made in that order.

On page 7 of the Plaintiff's Statement of Claims—Issues for Trial, the Trustee argues that the "one year constant Treasury yield" is the appropriate measure for pre-judgment interest. First, the Court notes that the citation by the Trustee to the case of *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472 (7th Cir.1999) is inaccurate; the Trustee cited to Volume 122 of the Federal Reporter, Third Series. More importantly, that case is not controlling, dealing as it does with special circumstances outside the scope of avoidance actions under the Bankruptcy Code.

■ As stated in *In re Milwaukee Cheese Wisconsin, Incorporated*, 112 F.3d 845, 849 (7th Cir.1997) [a case decided under 11 U.S.C. § 547, but the principles of which apply with equal force to this case]:

Doubtless judges have discretion to exercise when deciding whether to award prejudgment interest-more discretion than they possess when deciding wheth-

---

**19.** Under applicable law, this Court has *no* ability to request certification of any question of state law to the Indiana Supreme Court. This case has lingered long enough, and the Court will not begin to undertake the machinations involved in that certification process.

er to avoid a preferential transfer. Discretion is not, however, authorization to decide who deserves the money more. Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so. The only reason appellants give why discretion should have been exercised in their favor is that the case has lasted a long time, so interest has mounted; an award now, they say, would be "punitive." This misunderstands why courts award prejudgment interest. Compensation deferred is compensation reduced by the time value of money; if the proceeds had been returned to Milwaukee Cheese's estate and distributed to the creditors, they would have been able to earn interest on it during the last decade. That is why prejudgment interest is an ingredient of full compensation. It is also why an award, no matter how large, cannot be called "punitive": defendants can invest the funds while the litigation proceeds, then use the interest they receive to satisfy the obligation. (emphasis supplied)

The foregoing direction to federal courts in the Seventh Circuit to award pre-judgment interest as the rule rather than as the exception is essentially a reiteration of the determination previously made in *Gorenstein Enterprises, Inc. v. Quality Care—USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989), which stated:

While the statute makes no reference to prejudgment interest, the Gorensteins do not question that federal common law authorizes the award of such interest in appropriate cases to victims of violations of federal law. See, e.g., *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Rodgers v. United States*, 332

U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947); *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1297–99 (7th Cir. 1987); *Central Rivers Towing, Inc. v. City of Beardstown*, 750 F.2d 565, 574 (7th Cir.1984); *Hillier v. Southern Towing Co.*, 740 F.2d 583 (7th Cir.1984); *Myron v. Chicoine*, 678 F.2d 727, 733–34 (7th Cir.1982); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988 (6th Cir.1982); *L.P. Larson, Jr., Co. v. William Wrigley, Jr., Co.*, 20 F.2d 830, 836 (7th Cir.1927)—the last a trademark case. The areas in which such interest is allowed, illustrated by the cases just cited, are diverse. The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay.

■ The date from which prejudgment interest accrues is the date of demand for return of transferred property, or the date of the filing of the adversary proceeding seeking recovery of property, whichever is earlier. In this case, the record establishes the date of the filing of the adversary complaint as the appropriate date, and thus prejudgment interest is awarded from June 27, 2001 to the date of entry of judgment with respect to the recoveries adjudged for the Trustee. *See, In re Industrial and Mun. Engineering, Inc.*, 127 B.R. 848 (Bankr.C.D.Ill.1990).

■ The next question which arises is the rate at which interest is to be imposed. As stated in *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir.1998):

Unlike postjudgment interest, there is no statutory rate of prejudgment interest, *see Gorenstein Enters. v. Quality*

*Care–U.S.A., Inc.,* 874 F.2d 431, 436 (7th Cir.1989), and the amount of prejudgment interest required to properly compensate the victim can vary depending on the particular circumstances of the case. Accordingly, we entrusted the details of the calculation to the discretion of the district court, *see* 31 F.3d [581] at 587, and our review is limited to whether the district court has reasonably applied the appropriate federal common law principles-including the guidance provided by our previous opinion. *See United States v. Taylor,* 487 U.S. 326, 336, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988); *Cook v. Niedert,* 142 F.3d 1004, 1011 (7th Cir.1998). In our opinion remanding for determination of prejudgment interest, we indicated that "the best starting point is to award interest at the market rate, *which means an average of the prime rate for the years in question.*" 31 F.3d at 587 (emphasis added).

The foregoing statement was made more conclusive in *First National Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir.1999), as follows:

> Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in "refined rate-setting" directed at determining a more accurate market rate for interest. *Cement Division, National Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111, 1114 (7th Cir. 1998); *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir. 1992). We hold today that to set aside this practice and award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation.

The "prime rate" is that reported by the Federal Reserve Board; *see, Till v. SCS Credit Corporation,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). The concept of "average prime rate" is meant to apply to a circumstance in which a single sum is payable upon a date certain. What in the world is the "average" of the prime rate for "the years in question"? The prime rate can fluctuate drastically within a year.

Following the dictates of *Cement Division, National Gypsum Co., supra.,* the pre-judgment interest rate in this case is to be the "average of the prime rate for the years in question". This is not a "weighted" average, which would be far too complicated to determine by anyone other than a mathematician. It is impossible to precisely determine what the Seventh Circuit has decreed. The prime rate on July 29, 2001 was 7.00%; the prime rate now is 8.25%. From July 1, 2001 to November 2005, the prime rate was below 7.00%, and it has climbed upward since then. With all due respect to the Seventh Circuit, the concept of the "average prime rate for the years in question" is *impossible* to definitely define without more guidance concerning the computational methodology to be used. However, the Court must do its best to determine the meaning of the concept, and the best that can be done is to add together the respective prime rates of interest determined by the Federal Reserve Board throughout the period beginning with the date of the filing of this adversary proceeding to the date of entry of judgment, and to then divide this sum by the number of prime rate changes during that period. The sum of the separately-established prime rates for the period is 156, and there were 26 separate prime rates set during this period. The resulting rate of pre-judgment interest is therefore 6.00%.

The foregoing constitute the findings of fact and conclusions of law with respect to all issues presented to this Court in this adversary proceeding.

923

**VIII Judgment**

Judgment is entered separately.